## BREED, DIRECTOR, CALIFORNIA YOUTH AUTHORITY *v.* JONES

No. 73–1995.   Argued February 25–26, 1975—Decided May 27, 1975

BURGER, C. J., delivered the opinion for a unanimous Court.

*Russel Iungerich,* Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *S. Clark Moore,* Assistant Attorney General, and *Kent L. Richland,* Deputy Attorney General.

*Robert L. Walker* argued the cause for respondent. With him on the brief was *Peter Bull.**

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the prosecution of respondent as an adult, after Juvenile Court proceedings which resulted in a finding that respondent had violated a criminal statute and a subsequent finding that he was unfit for treatment as a juvenile, violated the Fifth and Fourteenth Amendments to the United States Constitution.

*Briefs of *amici curiae* urging affirmance were filed by *Alfred L. Scanlan* for the National Council of Juvenile Court Judges; by *David Gilman* for the National Council on Crime and Delinquency et al.; and by *Richard S. Buckley* and *Laurance S. Smith* for the California Public Defenders Assn.

On February 9, 1971, a petition was filed in the Superior Court of California, County of Los Angeles, Juvenile Court, alleging that respondent, then 17 years of age, was a person described by Cal. Welf. & Inst'ns Code § 602 (1966),[1] in that, on or about February 8, while armed with a deadly weapon, he had committed acts which, if committed by an adult, would constitute the crime of robbery in violation of Cal. Penal Code § 211 (1970). The following day, a detention hearing was held, at the conclusion of which respondent was ordered detained pending a hearing on the petition.[2]

The jurisdictional or adjudicatory hearing was conducted on March 1, pursuant to Cal. Welf. & Inst'ns Code § 701 (1966).[3] After taking testimony from two

---

[1] As of the date of filing of the petition in this case, Cal. Welf. & Inst'ns Code § 602 (1966) provided:

"Any person under the age of 21 years who violates any law of this State or of the United States or any ordinance of any city or county of this State defining crime or who, after having been found by the juvenile court to be a person described by Section 601, fails to obey any lawful order of the juvenile court, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court."

An amendment in 1971, not relevant here, lowered the jurisdictional age from 21 to 18. 1971 Cal. Stats. 3766, c. 1748, § 66.

[2] See Cal. Welf. & Inst'ns Code §§ 632, 635, 636 (1966). The probation officer was required to present a prima facie case that respondent had committed the offense alleged in the petition. *In re William M.*, 3 Cal. 3d 16, 473 P. 2d 737 (1970). Respondent was represented by court-appointed counsel at the detention hearing and thereafter.

[3] At the time of the hearing, Cal. Welf. & Inst'ns Code § 701 (1966) provided:

"At the hearing, the court shall first consider only the question whether the minor is a person described by Sections 600, 601, or 602, and for this purpose, any matter or information relevant and material to the circumstances or acts which are alleged to bring him within the jurisdiction of the juvenile court is admissible and may

prosecution witnesses and respondent, the Juvenile Court found that the allegations in the petition were true and that respondent was a person described by § 602, and it sustained the petition. The proceedings were continued for a dispositional hearing,[4] pending which the court ordered that respondent remain detained.

---

be received in evidence; however, *a preponderance of evidence,* legally admissible in the trial of criminal cases, must be adduced to support a finding that the minor is a person described by Section 602, and a preponderance of evidence, legally admissible in the trial of civil cases must be adduced to support a finding that the minor is a person described by Sections 600 or 601. When it appears that the minor has made an extrajudicial admission or confession and denies the same at the hearing, the court may continue the hearing for not to exceed seven days to enable the probation officer to subpoena witnesses to attend the hearing to prove the allegations of the petition. If the minor is not represented by counsel at the hearing, it shall be deemed that objections that could have been made to the evidence were made." (Emphasis added.)

A 1971 amendment substituted "proof beyond a reasonable doubt supported by evidence" for the language in italics. 1971 Cal. Stats. 1832, c. 934, § 1. Respondent does not claim that the standard of proof at the hearing failed to satisfy due process. See *In re Winship,* 397 U. S. 358 (1970); *DeBacker* v. *Brainard,* 396 U. S. 28, 31 (1969).

Hereafter, the § 701 hearing will be referred to as the adjudicatory hearing.

[4] At the time, Cal. Welf. & Inst'ns Code § 702 (Supp. 1968) provided:

"After hearing such evidence, the court shall make a finding, noted in the minutes of the court, whether or not the minor is a person described by Sections 600, 601, or 602. If it finds that the minor is not such a person, it shall order that the petition be dismissed and the minor be discharged from any detention or restriction theretofore ordered. If the court finds that the minor is such a person, it shall make and enter its findings and order accordingly and shall then proceed to hear evidence on the question of the proper disposition to be made of the minor. Prior to doing so, it may continue the hearing, if necessary, to receive the social study of the probation officer or to receive other evidence on its own motion or the mo-

At a hearing conducted on March 15, the Juvenile Court indicated its intention to find respondent "not . . . amenable to the care, treatment and training program available through the facilities of the juvenile court" under Cal. Welf. & Inst'ns Code § 707 (Supp. 1967).[5] Respondent's counsel orally moved "to continue the

tion of a parent or guardian for not to exceed 10 judicial days if the minor is detained during such continuance, and if the minor is not detained, it may continue the hearing to a date not later than 30 days after the date of filing of the petition. The court may, for good cause shown continue the hearing for an additional 15 days, if the minor is not detained. The court may make such order for detention of the minor or his release from detention, during the period of the continuance, as is appropriate."

[5] At the time, Cal. Welf. & Inst'ns Code § 707 (Supp. 1967) provided:

"At any time during a hearing upon a petition alleging that a minor is, by reason of violation of any criminal statute or ordinance, a person described in Section 602, when substantial evidence has been adduced to support a finding that the minor was 16 years of age or older at the time of the alleged commission of such offense and that the minor would not be amenable to the care, treatment and training program available through the facilities of the juvenile court, or if, at any time after such hearing, a minor who was 16 years of age or older at the time of the commission of an offense and who was committed therefor by the court to the Youth Authority, is returned to the court by the Youth Authority pursuant to Section 780 or 1737.1, the court may make a finding noted in the minutes of the court that the minor is not a fit and proper subject to be dealt with under this chapter, and the court shall direct the district attorney or other appropriate prosecuting officer to prosecute the person under the applicable criminal statute or ordinance and thereafter dismiss the petition or, if a prosecution has been commenced in another court but has been suspended while juvenile court proceedings are held, shall dismiss the petition and issue its order directing that the other court proceedings resume.

"In determining whether the minor is a fit and proper subject to be dealt with under this chapter, the offense, in itself, shall not be sufficient to support a finding that such minor is not a fit and

matter on the ground of surprise," contending that respondent "was not informed that it was going to be a fitness hearing." The court continued the matter for one week, at which time, having considered the report of the probation officer assigned to the case and having heard her testimony, it declared respondent "unfit for treatment as a juvenile," [6] and ordered that he be prosecuted as an adult.[7]

Thereafter, respondent filed a petition for a writ of habeas corpus in Juvenile Court, raising the same double jeopardy claim now presented. Upon the denial of that petition, respondent sought habeas corpus relief in the California Court of Appeal, Second Appellate District. Although it initially stayed the criminal prosecution pending against respondent, that court denied the petition. *In re Gary J.,* 17 Cal. App. 3d 704, 95 Cal.

---

proper subject to be dealt with under the provisions of the Juvenile Court Law.

"A denial by the person on whose behalf the petition is brought of any or all of the facts or conclusions set forth therein or of any inference to be drawn therefrom is not, of itself, sufficient to support a finding that such person is not a fit and proper subject to be dealt with under the provisions of the Juvenile Court Law.

"The court shall cause the probation officer to investigate and submit a report on the behavioral patterns of the person being considered for unfitness."

[6] The Juvenile Court noted:

"This record I have read is one of the most threatening records I have read about any Minor who has come before me.

"We have, as a matter of simple fact, no less than three armed robberies, each with a loaded weapon. The degree of delinquency which that represents, the degree of sophistication which that represents and the degree of impossibility of assistance as a juvenile which that represents, I think is overwhelming . . . ." App. 33.

[7] In doing so, the Juvenile Court implicitly rejected respondent's double jeopardy argument, made at both the original § 702 hearing and in a memorandum submitted by counsel prior to the resumption of that hearing after the continuance.

Rptr. 185 (1971). The Supreme Court of California denied respondent's petition for hearing.

After a preliminary hearing respondent was ordered held for trial in Superior Court, where an information was subsequently filed accusing him of having committed robbery, in violation of Cal. Penal Code § 211 (1970), while armed with a deadly weapon, on or about February 8, 1971. Respondent entered a plea of not guilty, and he also pleaded that he had "already been placed once in jeopardy and convicted of the offense charged, by the judgment of the Superior Court of the County of Los Angeles, Juvenile Court, rendered . . . on the 1st day of March, 1971." App. 47. By stipulation, the case was submitted to the court on the transcript of the preliminary hearing. The court found respondent guilty of robbery in the first degree under Cal. Penal Code § 211a (1970) and ordered that he be committed to the California Youth Authority.[8] No appeal was taken from the judgment of conviction.

On December 10, 1971, respondent, through his mother as guardian *ad litem*, filed the instant petition for a writ of habeas corpus in the United States District Court for the Central District of California. In his petition he alleged that his transfer to adult court pursuant to Cal. Welf. & Inst'ns Code § 707 and subsequent trial there

---

[8] The authority for the order of commitment derived from Cal. Welf. & Inst'ns Code § 1731.5 (Supp. 1971). At the time of the order, Cal. Welf. & Inst'ns Code § 1771 (1966) provided:

"Every person convicted of a felony and committed to the authority shall be discharged when such person reaches his 25th birthday, unless an order for further detention has been made by the committing court pursuant to Article 6 (commencing with Section 1800) or unless a petition is filed under Article 5 of this chapter. In the event such a petition under Article 5 is filed, the authority shall retain control until the final disposition of the proceeding under Article 5."

"placed him in double jeopardy." App. 13. The District Court denied the petition, rejecting respondent's contention that jeopardy attached at his adjudicatory hearing. It concluded that the "distinctions between the preliminary procedures and hearings provided by California law for juveniles and a criminal trial are many and apparent and the effort of [respondent] to relate them is unconvincing," and that "even assuming jeopardy attached during the preliminary juvenile proceedings . . . it is clear that no new jeopardy arose by the juvenile proceeding sending the case to the criminal court." 343 F. Supp. 690, 692 (1972).

The Court of Appeals reversed, concluding that applying double jeopardy protection to juvenile proceedings would not "impede the juvenile courts in carrying out their basic goal of rehabilitating the erring youth," and that the contrary result might "do irreparable harm to or destroy their confidence in our judicial system." The court therefore held that the Double Jeopardy Clause "is fully applicable to juvenile court proceedings." 497 F. 2d 1160, 1165 (CA9 1974).

Turning to the question whether there had been a constitutional violation in this case, the Court of Appeals pointed to the power of the Juvenile Court to "impose severe restrictions upon the juvenile's liberty," *ibid.,* in support of its conclusion that jeopardy attached in respondent's adjudicatory hearing.[9] It rejected petitioner's contention that no new jeopardy attached when respondent was referred to Superior Court and subsequently tried and convicted, finding "continuing jeopardy" principles

---

[9] In reaching this conclusion, the Court of Appeals also relied on *Fain* v. *Duff,* 488 F. 2d 218 (CA5 1973), cert. pending, No. 73–1768, and *Richard M.* v. *Superior Court,* 4 Cal. 3d 370, 482 P. 2d 664 (1971), and it noted that "California concedes that jeopardy attaches when the juvenile is adjudicated a ward of the court." 497 F. 2d, at 1166.

advanced by petitioner inapplicable. Finally, the Court of Appeals observed that acceptance of petitioner's position would "allow the prosecution to review in advance the accused's defense and, as here, hear him testify about the crime charged," a procedure it found offensive to "our concepts of basic, even-handed fairness." The court therefore held that once jeopardy attached at the adjudicatory hearing, a minor could not be retried as an adult or a juvenile "absent some exception to the double jeopardy prohibition," and that there "was none here." *Id.*, at 1168.

We granted certiorari because of a conflict between Courts of Appeals and the highest courts of a number of States on the issue presented in this case and similar issues and because of the importance of final resolution of the issue to the administration of the juvenile-court system.

I

The parties agree that, following his transfer from Juvenile Court, and as a defendant to a felony information, respondent was entitled to the full protection of the Double Jeopardy Clause of the Fifth Amendment, as applied to the States through the Fourteenth Amendment. See *Benton* v. *Maryland*, 395 U. S. 784 (1969). In addition, they agree that respondent was put in jeopardy by the proceedings on that information, which resulted in an adjudication that he was guilty of robbery in the first degree and in a sentence of commitment. Finally, there is no dispute that the petition filed in Juvenile Court and the information filed in Superior Court related to the "same offence" within the meaning of the constitutional prohibition. The point of disagreement between the parties, and the question for our decision, is whether, by reason of the proceedings in Juvenile Court, respondent was "twice put in jeopardy."

## II

Jeopardy denotes risk. In the constitutional sense, jeopardy describes the risk that is traditionally associated with a criminal prosecution. See *Price* v. *Georgia,* 398 U. S. 323, 326, 329 (1970); *Serfass* v. *United States,* 420 U. S. 377, 387–389 (1975). Although the constitutional language, "jeopardy of life or limb," suggests proceedings in which only the most serious penalties can be imposed, the Clause has long been construed to mean something far broader than its literal language. See *Ex parte Lange,* 18 Wall. 163, 170–173 (1874).[10] At the same time, however, we have held that the risk to which the Clause refers is not present in proceedings that are not "essentially criminal." *Helvering* v. *Mitchell,* 303 U. S. 391, 398 (1938). See *United States ex rel. Marcus* v. *Hess,* 317 U. S. 537 (1943); *One Lot Emerald Cut Stones* v. *United States,* 409 U. S. 232 (1972). See also J. Sigler, Double Jeopardy 60–62 (1969).

Although the juvenile-court system had its genesis in the desire to provide a distinctive procedure and setting to deal with the problems of youth, including those manifested by antisocial conduct, our decisions in recent years have recognized that there is a gap between the originally benign conception of the system and its realities. With the exception of *McKeiver* v. *Pennsylvania,* 403 U. S. 528 (1971), the Court's response to that perception has been to make applicable in juvenile proceedings constitutional guarantees associated with tradi-

---

[10] Distinctions which in other contexts have proved determinative of the constitutional rights of those charged with offenses against public order have not similarly confined the protection of the Double Jeopardy Clause. Compare *Robinson* v. *Neil,* 409 U. S. 505 (1973), with *Baldwin* v. *New York,* 399 U. S. 66 (1970), and *Argersinger* v. *Hamlin,* 407 U. S. 25 (1972). For the details of Robinson's trial for violating a city ordinance, see *Robinson* v. *Henderson,* 268 F. Supp. 349 (ED Tenn. 1967), aff'd, 391 F. 2d 933 (CA6 1968).

tional criminal prosecutions. *In re Gault,* 387 U. S. 1 (1967); *In re Winship,* 397 U. S. 358 (1970). In so doing the Court has evinced awareness of the threat which such a process represents to the efforts of the juvenile-court system, functioning in a unique manner, to ameliorate the harshness of criminal justice when applied to youthful offenders. That the system has fallen short of the high expectations of its sponsors in no way detracts from the broad social benefits sought or from those benefits that can survive constitutional scrutiny.

We believe it is simply too late in the day to conclude, as did the District Court in this case, that a juvenile is not put in jeopardy at a proceeding whose object is to determine whether he has committed acts that violate a criminal law and whose potential consequences include both the stigma inherent in such a determination and the deprivation of liberty for many years.[11] For it is clear under our cases that determining the relevance of constitutional policies, like determining the applicability of constitutional rights, in juvenile proceedings, requires that courts eschew "the 'civil' label-of-convenience which has been attached to juvenile proceedings," *In re Gault, supra,* at 50, and that "the juvenile process . . . be candidly appraised." 387 U. S., at 21. See *In re Winship, supra,* at 365–366.

As we have observed, the risk to which the term jeopardy refers is that traditionally associated with "actions intended to authorize criminal punishment to vindicate public justice." *United States ex rel. Marcus* v. *Hess, supra,* at 548–549. Because of its purpose and potential consequences, and the nature and resources of the State,

---

[11] At the time of respondent's dispositional hearing, permissible dispositions included commitment to the California Youth Authority until he reached the age of 21 years. See Cal. Welf. & Inst'ns Code §§ 607, 731 (1966). Petitioner has conceded that the "adjudicatory hearing is, in every sense, a court trial." Tr. of Oral Arg. 4.

such a proceeding imposes heavy pressures and bur-
dens—psychological, physical, and financial—on a person
charged. The purpose of the Double Jeopardy Clause
is to require that he be subject to the experience only
once "for the same offence." See *Green* v. *United States,*
355 U. S. 184, 187 (1957); *Price* v. *Georgia,* 398 U. S., at
331; *United States* v. *Jorn,* 400 U. S. 470, 479 (1971)
(opinion of Harlan, J.).

In *In re Gault, supra,* at 36, this Court concluded that,
for purposes of the right to counsel, a "proceeding where
the issue is whether the child will be found to be 'delin-
quent' and subjected to the loss of his liberty for years
is comparable in seriousness to a felony prosecution."
See *In re Winship, supra,* at 366. The Court stated that
the term "delinquent" had "come to involve only slightly
less stigma than the term 'criminal' applied to adults,"
*In re Gault, supra,* at 24; see *In re Winship, supra,* at
367, and that, for purposes of the privilege against self-
incrimination, "commitment is a deprivation of liberty.
It is incarceration against one's will, whether it is called
'criminal' or 'civil.' " *In re Gault, supra,* at 50. See 387
U. S., at 27; *In re Winship, supra,* at 367.[12]

Thus, in terms of potential consequences, there is little
to distinguish an adjudicatory hearing such as was held
in this case from a traditional criminal prosecution. For
that reason, it engenders elements of "anxiety and insecu-

---

[12] Nor does the fact "that the purpose of the commitment is re-
habilitative and not punitive . . . change its nature. . . . Regard-
less of the purposes for which the incarceration is imposed, the fact
remains that it is incarceration. The rehabilitative goals of the
system are admirable, but they do not change the drastic nature
of the action taken. Incarceration of adults is also intended to
produce rehabilitation." *Fain* v. *Duff,* 488 F. 2d, at 225. See Presi-
dent's Commission on Law Enforcement and Administration of Jus-
tice, Task Force Report: Juvenile Delinquency and Youth Crime
8–9 (1967).

rity" in a juvenile, and imposes a "heavy personal strain." See *Green* v. *United States, supra,* at 187; *United States* v. *Jorn, supra,* at 479; Snyder, The Impact of the Juvenile Court Hearing on the Child, 17 Crime & Delinquency 180 (1971). And we can expect that, since our decisions implementing fundamental fairness in the juvenile-court system, hearings have been prolonged, and some of the burdens incident to a juvenile's defense increased, as the system has assimilated the process thereby imposed. See Note, Double Jeopardy and the Waiver of Jurisdiction in California's Juvenile Courts, 24 Stan. L. Rev. 874, 902 n. 138 (1972). Cf. Canon & Kolson, Rural Compliance with Gault: Kentucky, A Case Study, 10 J. Fam. L. 300, 320–326 (1971).

We deal here, not with "the formalities of the criminal adjudicative process," *McKeiver* v. *Pennsylvania,* 403 U. S., at 551 (opinion of BLACKMUN, J.), but with an analysis of an aspect of the juvenile-court system in terms of the kind of risk to which jeopardy refers. Under our decisions we can find no persuasive distinction in that regard between the proceeding conducted in this case pursuant to Cal. Welf. & Inst'ns Code § 701 (1966) and a criminal prosecution, each of which is designed "to vindicate [the] very vital interest in enforcement of criminal laws." *United States* v. *Jorn, supra,* at 479. We therefore conclude that respondent was put in jeopardy at the adjudicatory hearing. Jeopardy attached when respondent was "put to trial before the trier of the facts," 400 U. S., at 479, that is, when the Juvenile Court, as the trier of the facts, began to hear evidence. See *Serfass* v. *United States,* 420 U. S., at 388.[13]

---

[13] The same conclusion was reached by the California Court of Appeal in denying respondent's petition for a writ of habeas corpus. *In re Gary J.,* 17 Cal. App. 3d 704, 710, 95 Cal. Rptr. 185, 189 (1971).

### III

Petitioner argues that, even assuming jeopardy attached at respondent's adjudicatory hearing, the procedure by which he was transferred from Juvenile Court and tried on a felony information in Superior Court did not violate the Double Jeopardy Clause. The argument is supported by two distinct, but in this case overlapping, lines of analysis. First, petitioner reasons that the procedure violated none of the policies of the Double Jeopardy Clause or that, alternatively, it should be upheld by analogy to those cases which permit retrial of an accused who has obtained reversal of a conviction on appeal. Second, pointing to this Court's concern for "the juvenile court's assumed ability to function in a unique manner," *McKeiver* v. *Pennsylvania, supra,* at 547, petitioner urges that, should we conclude traditional principles "would otherwise bar a transfer to adult court after a delinquency adjudication," we should avoid that result here because it "would diminish the flexibility and informality of juvenile court proceedings without conferring any additional due process benefits upon juveniles charged with delinquent acts."

### A

We cannot agree with petitioner that the trial of respondent in Superior Court on an information charging the same offense as that for which he had been tried in Juvenile Court violated none of the policies of the Double Jeopardy Clause. For, even accepting petitioner's premise that respondent "never faced the risk of more than one punishment," we have pointed out that "the Double Jeopardy Clause . . . is written in terms of potential or risk of *trial* and conviction, not punishment." *Price* v. *Georgia,* 398 U. S., at 329. (Emphasis added.) And we have recently noted:

> "The policy of avoiding multiple trials has been

regarded as so important that exceptions to the principle have been only grudgingly allowed. Initially, a new trial was thought to be unavailable after appeal, whether requested by the prosecution or the defendant. . . . It was not until 1896 that it was made clear that a defendant could seek a new trial after conviction, even though the Government enjoyed no similar right. . . . Following the same policy, the Court has granted the Government the right to retry a defendant after a mistrial only where 'there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.' *United States* v. *Perez,* 9 Wheat. 579, 580 (1824)." *United States* v. *Wilson,* 420 U. S. 332, 343–344 (1975). (Footnote omitted.)

Respondent was subjected to the burden of two trials for the same offense; he was twice put to the task of marshaling his resources against those of the State, twice subjected to the "heavy personal strain" which such an experience represents. *United States* v. *Jorn,* 400 U. S., at 479. We turn, therefore, to inquire whether either traditional principles or "the juvenile court's assumed ability to function in a unique manner," *McKeiver* v. *Pennsylvania, supra,* at 547, supports an exception to the "constitutional policy of finality" to which respondent would otherwise be entitled. *United States* v. *Jorn, supra,* at 479.

### B

In denying respondent's petitions for writs of habeas corpus, the California Court of Appeal first, and the United States District Court later, concluded that no new jeopardy arose as a result of his transfer from Juvenile Court and trial in Superior Court. See *In re Gary J.,* 17 Cal. App. 3d, at 710, 95 Cal. Rptr., at 189; 343 F. Supp., at 692. In the view of those courts, the jeopardy that attaches at an adjudicatory hearing

continues until there is a final disposition of the case under the adult charge. See also *In re Juvenile,* 364 Mass. 531, 306 N. E. 2d 822 (1974). Cf. *Bryan* v. *Superior Court,* 7 Cal. 3d 575, 498 P. 2d 1079 (1972), cert. denied, 410 U. S. 944 (1973).

The phrase "continuing jeopardy" describes both a concept and a conclusion. As originally articulated by Mr. Justice Holmes in his dissent in *Kepner* v. *United States,* 195 U. S. 100, 134–137 (1904), the concept has proved an interesting model for comparison with the system of constitutional protection which the Court has in fact derived from the rather ambiguous language and history of the Double Jeopardy Clause. See *United States* v. *Wilson, supra,* at 351–352. Holmes' view has "never been adopted by a majority of this Court." *United States* v. *Jenkins,* 420 U. S. 358, 369 (1975).

The conclusion, "continuing jeopardy," as distinguished from the concept, has occasionally been used to explain why an accused who has secured the reversal of a conviction on appeal may be retried for the same offense. See *Green* v. *United States,* 355 U. S., at 189; *Price* v. *Georgia,* 398 U. S., at 326; *United States* v. *Wilson, supra,* at 343–344, n. 11. Probably a more satisfactory explanation lies in analysis of the respective interests involved. See *United States* v. *Tateo,* 377 U. S. 463, 465–466 (1964); *Price* v. *Georgia, supra,* at 329 n. 4; *United States* v. *Wilson, supra.* Similarly, the fact that the proceedings against respondent had not "run their full course," *Price* v. *Georgia, supra,* at 326, within the contemplation of the California Welfare and Institutions Code, at the time of transfer, does not satisfactorily explain why respondent should be deprived of the constitutional protection against a second trial. If there is to be an exception to that protection in the context of the juvenile-court system, it must be justified by interests of society, reflected in that unique institution,

or of juveniles themselves, of sufficient substance to render tolerable the costs and burdens, noted earlier, which the exception will entail in individual cases.

## C

The possibility of transfer from juvenile court to a court of general criminal jurisdiction is a matter of great significance to the juvenile. See *Kent* v. *United States,* 383 U. S. 541 (1966). At the same time, there appears to be widely shared agreement that not all juveniles can benefit from the special features and programs of the juvenile-court system and that a procedure for transfer to an adult court should be available. See, *e. g.,* National Advisory Commission on Criminal Justice Standards and Goals, Courts, Commentary to Standard 14.3, pp. 300–301 (1973). This general agreement is reflected in the fact that an overwhelming majority of jurisdictions permits transfer in certain circumstances.[14] As might be expected, the statutory provisions differ in numerous details. Whatever their differences, however, such transfer provisions represent an attempt to impart to the juvenile-court system the flexibility needed to deal with youthful offenders who cannot benefit from the specialized guidance and treatment contemplated by the system.

We do not agree with petitioner that giving respondent the constitutional protection against multiple trials in this context will diminish flexibility and informality to the extent that those qualities relate uniquely to the goals of the juvenile-court system.[15] We

---

[14] See generally Task Force Report, *supra,* n. 12, at 24–25. See also Rudstein, Double Jeopardy in Juvenile Proceedings, 14 Wm. & Mary L. Rev. 266, 297–300 (1972); Carr, The Effect of the Double Jeopardy Clause on Juvenile Proceedings, 6 U. Tol. L. Rev. 1, 21–22 (1974).

[15] That the flexibility and informality of juvenile proceedings are

agree that such a holding will require, in most cases, that the transfer decision be made prior to an adjudicatory hearing. To the extent that evidence concerning the alleged offense is considered relevant,[16] it may be that, in those cases where transfer is considered and rejected, some added burden will be imposed on the juvenile courts by reason of duplicative proceedings. Finally, the nature of the evidence considered at a transfer hearing may in

diminished by the application of due process standards is not open to doubt. Due process standards inevitably produce such an effect, but that tells us no more than that the Constitution imposes burdens on the functioning of government and especially of law enforcement institutions.

[16] Under Cal. Welf. & Inst'ns Code § 707 (1972), the governing criterion with respect to transfer, assuming the juvenile is 16 years of age and is charged with a violation of a criminal statute or ordinance, is amenability "to the care, treatment and training program available through the facilities of the juvenile court." The section further provides that neither "the offense, in itself" nor a denial by the juvenile of the facts or conclusions set forth in the petition shall be "sufficient to support a finding that [he] is not a fit and proper subject to be dealt with under the provisions of the Juvenile Court Law." See n. 5, *supra*. The California Supreme Court has held that the only factor a juvenile court must consider is the juvenile's "behavior pattern as described in the probation officer's report," *Jimmy H.* v. *Superior Court*, 3 Cal. 3d 709, 714, 478 P. 2d 32, 35 (1970), but that it may also consider, *inter alia*, the nature and circumstances of the alleged offense. See *id.*, at 716, 478 P. 2d, at 36.

In contrast to California, which does not require any evidentiary showing with respect to the commission of the offense, a number of jurisdictions require a finding of probable cause to believe the juvenile committed the offense before transfer is permitted. See Rudstein, *supra*, n. 14, at 298–299; Carr, *supra*, n. 14, at 21–22. In addition, two jurisdictions appear presently to require a finding of delinquency before the transfer of a juvenile to adult court. Ala. Code, Tit. 13, § 364 (1959) (see *Rudolph* v. *State*, 286 Ala. 189, 238 So. 2d 542 (1970)); W. Va. Code Ann. § 49–5–14 (1966).

some States require that, if transfer is rejected, a different judge preside at the adjudicatory hearing.[17]

We recognize that juvenile courts, perhaps even more than most courts, suffer from the problems created by spiraling caseloads unaccompanied by enlarged resources and manpower. See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime 7–8 (1967). And courts should be reluctant to impose on the juvenile-court system any additional requirements which could so strain its resources as to endanger its unique functions. However, the burdens that petitioner envisions appear to us neither qualitatively nor quantitatively sufficient to justify a departure in this context from the fundamental prohibition against double jeopardy.

A requirement that transfer hearings be held prior to adjudicatory hearings affects not at all the nature of the latter proceedings. More significantly, such a requirement need not affect the quality of decisionmaking at transfer hearings themselves. In *Kent* v. *United States,* 383 U. S., at 562, the Court held that hearings under the statute there involved "must measure up to the essentials of due process and fair treatment." However, the Court has never attempted to prescribe criteria for, or the nature and quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court. We require only that, whatever the relevant criteria, and whatever the evidence demanded, a State determine whether it wants to treat a juvenile within the juvenile-

---

[17] See, *e. g.,* Fla. Stat. Ann. § 39.09 (2)(g) (1974); Tenn. Code. Ann. § 37–234 (e) (Supp. 1974); Wyo. Stat. § 14–115.38 (c) (Supp. 1973); Uniform Juvenile Court Act § 34 (e), approved in July 1968 by the National Conference of Commissioners on Uniform State Laws. See also *Donald L.* v. *Superior Court,* 7 Cal. 3d 592, 598, 498 P. 2d 1098, 1101 (1972).

court system before entering upon a proceeding that may result in an adjudication that he has violated a criminal law and in a substantial deprivation of liberty, rather than subject him to the expense, delay, strain, and embarrassment of two such proceedings.[18]

Moreover, we are not persuaded that the burdens petitioner envisions would pose a significant problem for the administration of the juvenile-court system. The large number of jurisdictions that presently require that the transfer decision be made prior to an adjudicatory hearing,[19] and the absence of any indication that the juvenile courts in those jurisdictions have not been able to perform their task within that framework, suggest the contrary. The likelihood that in many cases the lack of need or basis for a transfer hearing can be recognized promptly reduces the number of cases in which a commitment of resources is necessary. In addition, we have no reason to believe that the resources

---

[18] We note that nothing decided today forecloses States from requiring, as a prerequisite to the transfer of a juvenile, substantial evidence that he committed the offense charged, so long as the showing required is not made in an adjudicatory proceeding. See *Collins* v. *Loisel*, 262 U. S. 426 429 (1923); *Serfass* v. *United States*, 420 U. S. 377, 391–392 (1975). The instant case is not one in which the judicial determination was simply a finding of, *e. g.*, probable cause. Rather, it was an adjudication that respondent had violated a criminal statute.

[19] See Rudstein, *supra*, n. 14, at 299–300; Carr, *supra*, n. 14, at 24, 57–58. See also Uniform Juvenile Court Act §§ 34 (a), (c); Council of Judges of the Nat. Council on Crime and Delinquency, Model Rules for Juvenile Courts, Rule 9 (1969); W. Sheridan, Legislative Guide for Drafting Family and Juvenile Court Acts §§ 27, 31 (a) (Dept. of HEW, Children's Bureau Pub. No. 472–1969). In contrast, apparently only three States presently require that a hearing on the juvenile petition or complaint precede transfer. Ala. Code, Tit. 13, § 364 (1959) (see *Rudolph* v. *State, supra*); Mass. Gen. Laws Ann., c. 119, § 61 (1969) (see *In re Juvenile*, 364 Mass. 531, 542, and n. 10, 306 N. E. 2d 822, 829–830, and n. 10 (1974)); W. Va. Code Ann. § 49–5–14 (1966).

available to those who recommend transfer or participate in the process leading to transfer decisions are inadequate to enable them to gather the information relevant to informed decision prior to an adjudicatory hearing. See generally *State* v. *Halverson*, 192 N. W. 2d 765, 769 (Iowa 1971); Rudstein, Double Jeopardy in Juvenile Proceedings, 14 Wm. & Mary L. Rev. 266, 305–306 (1972); Note, 24 Stan. L. Rev., at 897–899.[20]

To the extent that transfer hearings held prior to adjudication result in some duplication of evidence if transfer is rejected, the burden on juvenile courts will tend to be offset somewhat by the cases in which, because of transfer, no further proceedings in juvenile court are required. Moreover, when transfer has previously been rejected, juveniles may well be more likely to admit the commission of the offense charged, thereby obviating the need for adjudicatory hearings, than if transfer remains a possibility. Finally, we note that those States which presently require a different judge to preside at an adjudicatory hearing if transfer is rejected also permit waiver of that requirement.[21] Where the requirement is not waived, it is difficult to see a substantial strain on judicial resources. See Note, 24 Stan. L. Rev., at 900–901.

---

[20] We intimate no views concerning the constitutional validity of transfer following the attachment of jeopardy at an adjudicatory hearing where the information which forms the predicate for the transfer decision could not, by the exercise of due diligence, reasonably have been obtained previously. Cf., *e. g.*, *Illinois* v. *Somerville*, 410 U. S. 458 (1973).

[21] See the statutes cited in n. 16, *supra*. "The reason for this waiver provision is clear. A juvenile will ordinarily not want to dismiss a judge who has refused to transfer him to a criminal court. There is a risk of having another judge assigned to the case who is not as sympathetic. Moreover, in many cases, a rapport has been established between the judge and the juvenile, and the goal of rehabilitation is well on its way to being met." Brief for National Council of Juvenile Court Judges as *Amicus Curiae* 38.

Quite apart from our conclusions with respect to the burdens on the juvenile-court system envisioned by petitioner, we are persuaded that transfer hearings prior to adjudication will aid the objectives of that system. What concerns us here is the dilemma that the possibility of transfer after an adjudicatory hearing presents for a juvenile, a dilemma to which the Court of Appeals alluded. See *supra,* at 527. Because of that possibility, a juvenile, thought to be the beneficiary of special consideration, may in fact suffer substantial disadvantages. If he appears uncooperative, he runs the risk of an adverse adjudication, as well as of an unfavorable dispositional recommendation.[22] If, on the other hand, he is cooperative, he runs the risk of prejudicing his chances in adult court if transfer is ordered. We regard a procedure that results in such a dilemma as at odds with the goal that, to the extent fundamental fairness permits, adjudicatory hearings be informal and nonadversary. See *In re Gault,* 387 U. S., at 25–27; *In re Winship,* 397 U. S., at 366–367; *McKeiver* v. *Pennsylvania,* 403 U. S., at 534, 550. Knowledge of the risk of transfer after an adjudicatory hearing can only undermine the potential for informality and cooperation which was intended to be the hallmark of the juvenile-court system. Rather than concerning themselves with the matter at hand, establishing innocence or seeking a disposition best suited to individual

---

[22] Although denying respondent's petition for a writ of habeas corpus, the judge of the Juvenile Court noted: "If he doesn't open up with a probation officer there is of course the danger that the probation officer will find that he is so uncooperative that he cannot make a recommendation for the kind of treatment you think he really should have and, yet, as the attorney worrying about what might happen a[t] the disposition hearing, you have to advise him to continue to more or less stand upon his constitutional right not to incriminate himself . . . ." App. 38. See Note, Double Jeopardy and the Waiver of Jurisdiction in California's Juvenile Courts, 24 Stan. L. Rev. 874, 902 n. 137 (1972).

correctional needs, the juvenile and his attorney are pressed into a posture of adversary wariness that is conducive to neither. Cf. Kay & Segal, The Role of the Attorney in Juvenile Court Proceedings: A Non-Polar Approach, 61 Geo. L. J. 1401 (1973); Carr, The Effect of the Double Jeopardy Clause on Juvenile Proceedings, 6 U. Tol. L. Rev. 1, 52–54 (1974).[23]

## IV

We hold that the prosecution of respondent in Superior Court, after an adjudicatory proceeding in Juvenile Court, violated the Double Jeopardy Clause of the Fifth Amendment, as applied to the States through the Fourteenth Amendment. The mandate of the Court of Appeals, which was stayed by that court pending our decision, directs the District Court "to issue a writ of habeas corpus directing the state court, within 60 days, to vacate the adult conviction of Jones and either set him free or remand him to the juvenile court for disposition." Since respondent is no longer subject to the jurisdiction of the California Juvenile Court, we vacate the judgment and remand the case to the Court of Appeals for such further proceedings consistent with this opinion as may be appropriate in the circumstances.

*So ordered.*

---

[23] With respect to the possibility of "making the juvenile proceedings confidential and not being able to be used against the minor," the judge of the Juvenile Court observed: "I must say that doesn't impress me because if the minor admitted something in the Juvenile Court and named his companions nobody is going to eradicate from the minds of the district attorney or other people the information they obtained." App. 41–42.