STATE of Wisconsin, Plaintiff-Appellant,

v.

Marcel KILLEBREW, Defendant-Respondent-Petitioner.
[Case No. 81–1345–CR.]

STATE of Wisconsin, Plaintiff-Appellant,

v.

Eugene ESPINOZA, Defendant-Respondent.
[Case No. 81–2252–CR.]

Supreme Court

*Nos. 81–1345–CR, 81–2252–CR. Argued October 5, 1983.—*
*Decided November 30, 1983.*

(Also reported in 340 N.W.2d 470.)

For the defendants there were briefs and oral argument by *John E. Tradewell,* assistant state public defender.

For the plaintiff-appellant the cause was argued by *Jeffrey M. Gabrysiak,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J. This is a consolidation of two criminal cases: a review of a decision of the court of appeals, reversing an order of the Circuit Court for Dane County, Hon. Mark A. Frankel, Circuit Judge, dismissing a criminal prosecution for escape against Marcel Killebrew; and an appeal from an order of the Circuit Court for Dane County, Hon. Mark A. Frankel, Circuit Judge, dismissing a criminal prosecution for escape against Eugene Espinoza. The *Espinoza* case was taken by this court on a petition to bypass under sec. 808.05(1), Stats. 1981–82.

The question is whether a criminal escape prosecution is barred under the double jeopardy clauses of the state and federal constitutions if the escapee has already been subjected to disciplinary action in the prison. We hold that administrative discipline for escape does not preclude criminal prosecution for the same incident. We therefore affirm the decision of the court of appeals in *State v. Killebrew,* 109 Wis. 2d 611, 327 N.W.2d 155 (1982) and reverse the order of the circuit court in *Espinoza.*

The two cases consolidated in this court arose out of separate incidents. The defendant Marcel Killebrew was incarcerated at the Wisconsin Correctional Camp in Oregon. He allegedly left that institution without permission and was subsequently apprehended and returned.

At the time of Killebrew's recapture, the prison was operating under a Division of Corrections Administrative Procedures Manual. The defendant was charged with having left state property without permission in violation of rule number 401. He waived formal hearing on the alleged violation and consented to disposition of the matter by the prison adjustment committee. The committee determined that a rule violation had occurred and placed Killebrew on 360 days of "program segregation" and forfeited five days earned good time. The defendant was returned to the general prison population after approximately fifty days in segregated confinement.

On June 9, 1980, Killebrew was charged with escape in violation of sec. 946.42(3)(a), Stats. 1979–80.[1] He moved to dismiss the complaint on the grounds that he had already been punished and the initiation of criminal proceedings was therefore barred under the fifth amendment double jeopardy clause. Judge Mark Frankel granted the motion in a memorandum decision dated June 11, 1981. The state appealed. On November 9, 1982, the court of appeals reversed the trial court's order dismissing the complaint. This court granted the defendant's petition for review.

Eugene Espinoza is alleged to have left the Oakhill Correctional Institution in Fitchburg without permission. He was apprehended and returned to the prison. Espinoza's escape and recapture took place after the effective date of Chapter HSS 303 Wis. Ad. Code. He was found to have violated sec. HSS 303.22. The adjustment committee imposed eight days of "adjustment segregation,"

---

[1] Section 946.42(3)(a), Stats. 1979–80 provides:

"946.42 **Escape.** . . . (3) Any person in custody under any of the following circumstances who intentionally escapes from custody is guilty of a Class D felony:

"(a) Sentenced to a state prison: . . ."

180 days of "program segregation" and forfeited all of the defendant's accumulated good time.

Espinoza was charged with escape in Dane County Circuit Court on September 28, 1981. Judge Frankel granted the defendant's motion to dismiss on double jeopardy grounds citing his decision in *Killebrew*. The state appealed. The court of appeals stayed consideration of the case pending possible review by this court of the court of appeals decision in *Killebrew*. After the petition for review was granted in *Killebrew*, Espinoza petitioned this court to bypass the court of appeals. This court granted the bypass petition under sec. 808.05(1), Stats. 1981–82.

Both the United States Constitution and the Constitution of the State of Wisconsin protect criminal defendants from being subjected to double jeopardy.[2] The federal prohibition has been held applicable to the states through the fourteenth amendment. *Benton v. Maryland,* 395 U.S. 784 (1969).

In *North Carolina v. Pearce,* 395 U.S. 711 (1969), the United States Supreme Court analyzed the Fifth Amendment double jeopardy guarantee as consisting of three separate constitutional protections. "It protects against a second prosecution for the same offense after acquittal.

---

[2] The Fifth Amendment to the United States Constitution states "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." Article I, section 8 of the Wisconsin Constitution states "no person for the same offense shall be put twice in jeopardy of punishment." This court has held that the state and federal double jeopardy guarantees are "identical in scope and purpose." *Day v. State,* 76 Wis. 2d 588, 591, 251 N.W.2d 811 *cert. denied,* 434 U.S. 848 (1977). Because of the similarity of the two provisions, this court has accepted decisions of the United States Supreme Court as governing the double jeopardy provisions of both constitutions. *State v. Rabe,* 96 Wis. 2d 48, 61 n. 7, 291 N.W.2d 809 (1980).

It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." 395 U.S. at 717. It is the protection against multiple punishment which is asserted by the defendants in this case.

The United States Supreme Court has never ruled on the question of whether disciplinary action by prison authorities forecloses criminal prosecution for the same conduct. A number of state and federal cases have held that administrative sanctions imposed by prison officials do not bar subsequent prosecution in a criminal court.[3]
[1]
The defendants argue that none of these cases are precedent for this case because all of them either, (1) are factually distinguishable; (2) are based on a serial prosecution analysis rather than a multiple punishment analysis; or (3) blindly rely on *Pagliaro v. Cox*, 143 F.2d 900 (8th Cir. 1944) which held that forfeiture of good time is not punishment under the Constitution on the grounds that good time is a statutorily created contingent privilege and therefore its forfeiture does not implicate the double jeopardy clause. Whatever the merit of those cases, we conclude that the administrative action taken in this case was not punishment under the constitution and prosecution on criminal escape charges is not barred by the double jeopardy clause.

[3] *Orosco v. United States*, 526 F. Supp. 756 (W.D. Ok. 1981); *United States v. Stuckey*, 441 F.2d 1104, (3rd Cir.), cert. denied, 404 U.S. 841 (1971); *United States v. Lepiscopo*, 429 F.2d 258 (5th Cir.), cert. denied, 400 U.S. 948 (1970); *United States v. Apker*, 419 F.2d 388 (9th Cir. 1969); *Rush v. United States*, 290 F.2d 709 (5th Cir. 1961); *Mullican v. United States*, 252 F.2d 398 (5th Cir. 1958); *Patterson v. United States*, 183 F.2d 327 (4th Cir.), cert. denied 340 U.S. 893 (1950); *State v. Loomis*, 629 S.W.2d 637 (Mo. App. 1982); *Pruitt v. State*, 274 S.C. 565, 266 S.E.2d 779 (1980); *State v. Kjeldahl*, 278 N.W.2d 58 (Minn. 1979); *State v. Weekly*, 90 S.D. 192, 240 N.W.2d 80 (1976); *State v. Lebo*, 129 Vt. 450, 282 A.2d 804 (1971).

The United States Supreme Court stated the test for determining when governmental action is punishment for double jeopardy purposes in *Helvering v. Mitchell,* 303 U.S. 391 (1938). The question in that case was whether an acquittal on a criminal tax fraud charge barred the government from assessing a civil penalty amounting to a fifty percent addition to the tax deficiency. The Court said:

"Mitchell contends that the proceeding is barred under the doctrine of double jeopardy because the 50 per centum addition of $364,354.92 is not a tax, but a criminal penalty intended as punishment for allegedly fraudulent acts. Unless this sanction was intended as punishment, so that the proceeding is essentially criminal, the double jeopardy clause provided for the defendant in criminal prosecutions is not applicable." 303 U.S. at 398–399.

The Court concluded that the fifty percent addition was a nonpunitive, remedial measure imposed as a safeguard for the protection of the revenue and to reimburse the government for the expense of investigation and the loss resulting from the taxpayer's fraud. Therefore, the assessment was not barred under the double jeopardy clause by the prior criminal acquittal.

The United States Supreme Court discussed the question of when jeopardy attaches under the constitution in the context of juvenile court adjudicatory hearings in the case of *Breed v. Jones,* 421 U.S. 519 (1975). In that case, the Court reiterated its holding in *Helvering v. Mitchell,* that double jeopardy applies only to proceedings that are "essentially criminal." 421 U.S. at 528. The Court further observed that "the risk to which the term jeopardy refers is that traditionally associated with actions intended to authorize criminal punishment to vindicate public justice." 421 U.S. at 529 citing *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 548–549 (1943).

This court recognized the controlling importance of intent in identifying punishment for double jeopardy purposes in *State ex rel. Flowers v. Department of Health & Social Services,* 81 Wis. 2d 376, 260 N.W.2d 727 (1978). That case addressed the question of whether the department at a parole revocation hearing could consider an incident for which Flowers had been prosecuted and acquitted in criminal court. Because the parole revocation was not punishment, consideration of past conduct, even conduct for which a jury had acquitted the defendant under a standard of beyond a reasonable doubt could still be proven[4] and used as a basis to revoke parole. The court said that jeopardy is absent from proceedings which are not "essentially criminal" and "a proceeding is criminal, for double jeopardy purposes, if it imposes a sanction intended as punishment. 81 Wis. 2d at 383. The court concluded that "revocation hearings are not concerned with retribution. Parole and probation are intended to foster the reintegration of the individual into society at the earliest opportunity." 81 Wis. 2d at 385. Furthermore, "the element of punishment in parole revocation is attributable to the crime for which the parolee was originally convicted and sentenced." 81 Wis. 2d at 386.

Subsequent to this court's decision in *Flowers,* the United States Supreme Court once again considered the question of what constitutes punishment under the constitution in *Bell v. Wolfish,* 441 U.S. 520 (1979). The question in that case was whether detention prior to trial deprived detainees of their liberty without due process of law. The Court stated that the proper inquiry in such a case is whether the restrictions placed on the detainees amounted to punishment. The Court said that in determining whether a given restriction is punishment:

---

[4] In a parole revocation hearing the standard of proof is a preponderance of the evidence. *Flowers,* 81 Wis. 2d at 388.

"A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell,* 441 U.S. at 538–539. (citations omitted).

In the context of the *Bell* case, the government's interest in ensuring the detainee's presence at trial and the institution's interest in maintaining jail security justified the restrictions applied and "dispel[ed] any inference that [the] restrictions [were] intended as punishment." 441 U.S. at 540.

The defendants argue that *Bell* should be interpreted to mean that any express mention of punishment or indication of a punitive intent is conclusive of the intent question and eliminates the need for further inquiry. We do not read *Bell* so narrowly. In many instances, governmental action has more than one aim. A prison administrator, whose primary intention in segregating a prisoner from the general prison population is to maintain order and safety and to assist the inmate to adjust his behavior in conformity with prison rules, may also be interested in deterring future antisocial or disruptive conduct. Under the defendants' reading of the *Bell* case,

the administrator's action is punishment even though its principal purposes are nonpunitive. The state then must choose between vindicating public justice through criminal prosecution or pursuing other legitimate nonpunitive aims. We do not construe the double jeopardy clause as requiring that choice. Governmental action is punishment under the double jeopardy clause if its principal purpose is punishment, retribution or deterrence. When the principal purpose is nonpunitive, the fact that a punitive motive may also be present does not make the action punishment.

The defendants agree that the controlling factor is intent but argue that this court should defer to the trial court's determination of whether the administrative disciplinary action taken by the prison was intended as punishment. They contend that intent is a question of fact and the trial court's determination of the issue should not be overturned on appeal if supported by credible evidence.

It is true that when the issue is one of an actor's mental state, the question is one of fact. However, the intent at issue in this case is of a completely different sort. Here we are concerned with the intent of an administrative agency as embodied in a set of written regulations. In identifying that intent, we undertake the same inquiry frequently made by appellate courts to determine the intent of a legislature as expressed in a statute.

Both defendants were placed on program segregation —Marcel Killebrew for a maximum term of 360 days and Eugene Espinoza for 180 days. The terms and conditions of program segregation are set forth in sec. HSS 303.70 Wis. Ad. Code.[5] Inmates on this status are segregated from the general prison population in cells which

---

[5] Although *Killebrew* was disciplined prior to the effective date of chapter HSS 303, Judge Frankel stated in his Memorandum Decision and the defendants do not disagree that the rules essentially codify existing practices.

must be furnished with certain enumerated necessities. They are allowed to have any personal property in their cells which can feasibly be moved from the quarters of the general population, except that they are not permitted to have personal electronic units such as televisions or radios during the first thirty-five days in segregation. The same visitation, mail and phone privileges are allowed residents in program segregation as are enjoyed by the general prison population. Provision is made for social and clinical services, program and recreation opportunities and exercise. Inmates on program segregation status cannot earn extra good time or compensation. They may not go to the canteen in person but may have items from the canteen brought to their cells on the same basis as other residents. Smoking is permitted unless it poses a hazard. Talking is permitted in a normal tone during approved times. No yelling or whistling is permitted.

Mr. Espinoza was also placed on adjustment segregation for the maximum term of eight days. Adjustment segregation imposes additional restrictions on the personal property an inmate is permitted to possess over what is allowed in program segregation. Inmates are prohibited to leave their cells except for urgent medical or psychological attention, showers, visits and emergencies endangering their safety in the cell. Smoking is forbidden and each institution is authorized to establish procedures relating to talking.

At the time defendant Killebrew was disciplined, the prison was operating under a now superceded Department of Corrections Administrative Procedures manual. Administrative Policies sec. 3.021[6] states the basic policies behind discipline in general and segregation in particular. That section states:

[6] This section was not included in the record. We take judicial notice of it under sec. 902.01, Stats. 1981–82.

"It is the policy of the Division of Corrections that a means shall be provided to maintain discipline and enforce necessary rules within each correctional facility. The proper use of discipline is consistent with the mandated goals and purposes of the Division which involve maximum treatment to each resident within a facility that offers safety to the general public, correctional employees and other residents. The institutions must ensure that residents are provided fair and impartial disposition of charges alleging violation of rules or criminal statutes.

"In keeping with this mandate, segregation is viewed as a special program status in that it physically separates individuals from the general population of an institution. Its sole purpose is to allow the resident and the institution to adjust behavior in order to become consistent with those rules and regulations required to maintain a safe and humane environment for both staff and resident."

Administrative Procedures sec. 3.020, which deals with program segregation, provides that the status may be imposed in any case in which the adjustment committee determines that the conduct of the resident warrants extended segregation. The section provides that "residents in this status shall be accorded maximum treatment opportunities and granted such privileges as are most conducive to assisting them in adjusting their conduct so that they can return to the general population." Inmates in program segregation are to be reviewed by the program review committee within nine days after their initial placement and at least once every thirty days thereafter. The rules require that in the committee's review of an inmate's status, "the resident's overall adjustment shall be the sole issue considered by the program review committee."

The defendants' brief directs our attention to a chart contained in an attachment to the rules. That chart divides the entire prison population into three groups: general population, administrative population and segregated

population. The administrative population is labeled nonpunitive." The segregated category, which includes program segregation, is labeled "punitive." The defendant argues that the existence of a clearly labeled nonpunitive alternative to placing an inmate on punitive segregated status is conclusive of the prison authorities' intent to punish.

We conclude that the principal purpose of program segregation under the outdated administrative procedures manual is remedial rather than punitive. A single word heading on a flow chart, though not to be ignored, is not conclusive of the intent behind the program. The statement of purpose and the description and guidelines . for program segregation clearly state the purpose of segregation as that of assisting the residents in adjusting their conduct in order to maintain a safe and humane environment in the prison. Punishment is secondary and incidental to the underlying remedial aims.

We reach the same conclusion as to the disciplinary action taken in Espinoza's case under sec. HSS 303 Wis. Ad. Code. The objectives of the disciplinary rules are listed in sec. HSS 303.01(3). They are:

". . . (3) The objectives of the disciplinary rules under this chapter are the following:

"(a) The maintenance of order in correctional institutions;

"(b) The maintenance of a safe setting in which inmates can participate in constructive programs;

"(c) The rehabilitation of inmates through the development of their ability to live with others, within rules;

"(d) Fairness in the treatment of inmates;

"(e) The development and maintenance of respect for the correctional system and for our system of government through fair treatment of inmates;

"(f) Punishment of inmates for misbehavior; and

"(g) Deterrence of misbehavior."

Five of the seven named objectives have to do with legitimate, nonpunitive governmental aims. The notes

■

accompanying sec. 303.01 emphasize the concern with maintaining order and rehabilitation. Punishment and deterrence are not mentioned in the notes. Moreover the criteria for deciding whether an inmate should be continued on program segregation status focus on the attitude and institutional adjustment of the inmate and his fitness to return to the general population.[7] It is

[7] Section HSS 303.70(12), Wisconsin Administrative Code provides:

"HSS 303.70 *Major penalties: program segregation.* . . . (12) *REVIEW OF PROGRAM SEGREGATION.* An inmate's status in program segregation may be reviewed at any time and he or she may be placed in the general population at any time by the superintendent. Such status must be reviewed every 30 days by the superintendent. Such review shall include a recommendation by the security director as to whether the inmate should remain in program segregation and an evaluation of the inmate by either the crisis intervention officer or the adjustment program supervisor, or both. In deciding whether an inmate should be removed from program segregation and placed in the general population, the superintendent shall consider:

"(a) The offense, including:

"1. Its nature and severity;

"2. Mitigating factors;

"3. Aggravating factors; and

"4. Length of sentence to program segregation;

"(b) Motivation and behavior of the inmate, including:

"1. Attitude toward himself or herself and others and changes in his or her attitude;

"2. Goals of the inmate;

"3. Physical and mental health; and

"4. Attempt to resolve emotional and mental disorders;

"(c) Institutional adjustment, including:

"1. Disciplinary record;

"2. Program involvement;

"3. Relationship to staff and inmates; and

"4. Security problems created by release;

"(d) Programs, including:

"1. Social and clinical services available to help the inmate; and

"2. Any programs available to help the inmate."

true that the words "punishment" and "penalty" are used in the rules in describing administrative disciplinary action. However, these terms are used loosely to refer to such minor sanctions as reprimands or loss of recreational privileges.

Punishment is not the primary or even a principal reason for the regulations. The primary purposes behind the new regulations are maintaining institutional order and safety and assisting individual rehabilitation. Escape is inconsistent with and destructive of those goals.

We hold that the administrative disciplinary action taken by the prison was not punishment under the constitution and therefore the state is not barred by the double jeopardy clause from prosecuting the defendants for escape under sec. 946.42(3)(a), Stats.

*By the Court.*—The decision of the court of appeals in *State v. Killebrew* is affirmed. The order of the trial court in *State v. Espinoza* is reversed and cause remanded to the Circuit Court for Dane County for further action consistent with this opinion.

SHIRLEY S. ABRAHAMSON, J. (concurring). I agree with the majority that the criminal escape prosecution is not barred under double jeopardy. I do not, however, find the majority's intent analysis persuasive or applicable in determining the question of multiple punishment under the multiple-punishment prohibition. See *Bell v. Wolfish*, 441 U.S. 520, 575 (1979) (Stevens, J., dissenting); Note, *A Definition of Punishment for Implementing the Double Jeopardy Clause's Multiple-Punishment Prohibition*, 90 Yale L.J. 632, 642–48 (1981).