Stacy Mechelle SIMPSON, Petitioner,

v.

Donald M. CAMPER, Respondent.

No. 89–0118–CV–W–JWO–3.

United States District Court,
W.D. Missouri, W.D.

June 26, 1990.
As Corrected Aug. 6, 1990.

Stacy M. Simpson, Chillicothe, Mo., pro se.

Lawrence Pelofsky, Overland Park, Kan., for petitioner.

Jared R. Cone, Mo. Atty. Gen., Jeff City, Mo., for respondent.

## MEMORANDUM OPINION AND ORDER GRANTING WRIT OF HABEAS CORPUS

ELMO B. HUNTER, Senior District Judge.

This case pends on a petition for writ of habeas corpus filed by petitioner which attacks the validity of her confinement at the Chillicothe Correctional Center in Chillicothe, Missouri. Petitioner was convicted after entry of an *Alford* plea upon a manslaughter charge after which she was sentenced to an eleven year prison term.

An evidentiary hearing was held in this Court on May 15, 1990 on the issue of the voluntariness of petitioner's *Alford* plea. Two other disputed issues must be resolved before the plea's voluntariness can be determined. Those issues relate to respondent State of Missouri's contention that petitioner is procedurally barred from habeas review in this Court for failure to pursue available state remedies and petitioner's claim that the evidence presented at petitioner's juvenile court hearing which certified her to stand trial as an adult on the criminal charge was insufficient as a matter of Constitutional law. A brief discussion of the factual and procedural background of this case follows. The parties have filed herein a Stipulation as to the authenticity of the records of state court proceedings. Those records have been filed in this proceeding.

### FACTS

On March 19, 1986, after a hearing in Bates County, Missouri juvenile court, petitioner was certified to stand trial as an adult for the shooting death of her mother

on September 5, 1985. (Stip. # 3). Petitioner was fourteen years old at the time. Subsequently, petitioner was charged with first degree murder and after a change of venue and change of judge were granted, she came to trial in Jasper County, Missouri. On September 16, 1986, petitioner filed a petition to enter an *Alford* plea pursuant to a plea bargain which also called for reduction of the charge to manslaughter, preparation of a presentence investigation and report and recommendation by the prosecution of probation for a term of five years. (Stip. # 5) Petitioner was represented during these proceedings by counsel retained by her father. Petitioner's plea was accepted on September 16, 1986 by Judge Thomas Elliston, Jasper County Circuit Court. (Stip. # 6). Petitioner, born June 23, 1971, was then fifteen years old.

On October 10, 1986, petitioner filed with the circuit court a petition to withdraw her plea entered September 16. (Stip. # 8). At that time, petitioner's counsel at the plea hearing, Mr. Lee Nation, had withdrawn his representation at petitioner's request. Petitioner was represented at the hearing on the motion to withdraw plea by new counsel, Mr. Kevin Hare. The court denied petitioner's motion on November 3, 1986 and sentenced petitioner to eleven years incarceration on that date. (Stip. # 10-11). On November 13, 1986, new counsel for petitioner filed with the Missouri Court of Appeals, Southern Division, a notice of appeal from the denial of petitioner's motion to withdraw plea. (Stip. # 12). That appeal was dismissed by the Court of Appeals on May 1, 1987 for failure to submit a record on appeal or otherwise comply with Missouri appellate rules of procedure. (Stip. # 15).

On March 26, 1987, while petitioner's direct appeal was pending, she filed, *pro se*, with the Missouri Supreme Court, a petition for writ of habeas corpus and motion for appointment of counsel. Those petitions were denied without hearing on April 14, 1987. (Stip. # 16).

On December 9, 1988, petitioner filed a *pro se* motion to file out of time a motion for post-conviction relief under Missouri Rule 24.035 and a motion for relief under that Rule. (Stip. # 20). Those motions were denied without hearing on January 3, 1989. (Stip. # 17). This petition for writ of habeas corpus was filed on February 6, 1989. As noted above, an evidentiary hearing was held on petitioner's habeas corpus petition on May 15, 1990.

## PROCEDURAL BAR

■ Respondent claims that petitioner's claims are barred from review in this Court for failure to raise the issues for state review by means of available Missouri post-conviction remedies. Claims raised by petitioner in both her original and amended petition for federal habeas corpus include the claims that petitioner's plea was involuntary and coerced, that no evidence was presented to warrant her certification to stand trial as an adult on a murder charge, a sixth amendment claim based upon ineffective assistance of appellate counsel and other claims alleging violation of petitioner's Constitutional rights.[1] Those same claims were raised in petitioner's petition for habeas corpus in state court and in the attempted postconviction motion for relief. As the direct appeal was abandoned, there is no way to tell what claims would have been raised had the appeal gone forward. Because the Court finds that this abandonment resulted in ineffective assistance of counsel and violation of petitioner's sixth amendment rights, the procedural bar alleged by respondent is no impediment to federal habeas review of her Constitutional claims.

Petitioner's direct appeal of the denial of her motion to withdraw plea was dismissed by the Missouri Court of Appeals for failure of petitioner's counsel to file a record on appeal or "to take the required steps to secure appellate review within the allowed time." (Stipulation # 15). No explanation

---

1. Claims raised in petitioner's original and amended federal habeas corpus petitions relating to specifics of the juvenile court certification procedure and Fourth Amendment claims have not been briefed and need not be reached in this Order.

for this failure to pursue the appeal which resulted in a procedural default of an available state remedy appears in the records submitted to the Court. That default normally results in a bar to federal habeas corpus review, unless petitioner can show cause and prejudice for the default. *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

■ In *Robinson v. Wyrick,* 635 F.2d 757 (8th Cir.1981), a state habeas petitioner's counsel submitted on direct appeal a brief which was "flagrantly deficient" and which wholly failed to preserve any issues for appellate review. The Court of Appeals held that petitioner's sixth amendment rights were violated by denial of "his right to a direct appeal of his conviction and [denial of] his constitutional right to effective counsel—just as much as if counsel had never filed a notice of appeal." *Id.* at 759. Further, such circumstances warranted a denial of effective assistance of counsel without a showing of prejudice or of likely success on appeal. *Id.* at 758. Surely a failure to file *any* brief or even a record on appeal constitutes a denial of petitioner's sixth amendment right to effective assistance of counsel in the pending case before this Court. Under *Robinson,* that denial constitutes cause for the procedural default resulting from failure to pursue petitioner's direct appeal of her motion to withdraw *Alford* plea, and the requirement of showing the usual prejudice prong of the test is unnecessary.[2] *See also Evitts v. Armstrong,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (criminal defendant entitled to effective assistance of counsel on first appeal as of right).

■ There is an additional reason that respondent's procedural bar argument fails. "The terms 'cause' and 'actual prejudice' are not rigid concepts; they take their meaning from ... principles of comity and finality ... [and] [i]n appropriate cases those principles must yield to the imperatives of correcting a fundamentally unjust incarceration." *Engle v. Isaac,* 456 U.S. 107, 135, 102 S.Ct. 1558, 1575, 71 L.Ed.2d 783 (1982). Where a federal habeas petitioner suffers from a procedural default and cannot overcome the barriers of cause and prejudice which bar federal review, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." 477 U.S. at 496, 106 S.Ct. at 2649. This Court finds that this petitioner fits into the "extraordinary" case of one who may be "actually innocent" of the crime for which she was convicted and whose conviction resulted from a violation of her Constitutional rights, namely denial of due process in the treatment afforded petitioner at the taking of her *Alford* plea, the denial of her motion to withdraw that plea and refusal of the trial judge to enforce the terms of the plea agreement which strongly influenced petitioner to enter an *Alford* plea. Further, petitioner has never pled guilty to the crime for which she was sentenced and has always, to the present time, maintained her innocence of the charge. At the evidentiary hearing in this Court, Lee Nation, who represented petitioner at the trial stage of the proceedings, testified that both he and the sheriff who investigated the murder

---

**2.** Respondent claimed, in its Response to this court's initial Order to Show Cause, that petitioner's remedy for ineffective assistance of counsel on appeal under state law was a motion to recall the mandate. Under applicable Missouri case law, respondent is correct. *In Interest of A.D.R.,* 603 S.W.2d 575 (Mo.1980) (en banc); *Hemphill v. State,* 566 S.W.2d 200 (Mo. 1978) (en banc) (correct procedure to challenge appellate conduct on grounds of ineffective assistance is motion to recall mandate by appellate court, not postconviction rule intended to correct errors by trial court). Petitioner's appeal was dismissed for failure to file a record in

May, 1987, over three years ago. That procedure at this point in time would not provide an effective remedy to petitioner, in light of the time which has expired since the original conviction challenged herein. Respondent has not briefed this claim nor furthered that argument since the evidentiary hearing held in this court.

Because petitioner's Sixth Amendment right to effective assistance of *appellate* counsel was violated by her counsel's failure to pursue her direct appeal, petitioner was not required to pursue her sixth amendment claim by state habeas review or a postconviction motion under Rule 27.26.

believed it was likely that Frank Simpson, petitioner's father, had actually committed the murder. (Evid. Tr. at 39).

## CERTIFICATION HEARING

On March 19, 1986, some six months after the crime occurred for which petitioner was subsequently convicted, a hearing was held in the Juvenile Division of the Circuit Court of Bates County, Missouri upon a petition filed pursuant to Missouri statutes by a juvenile officer for the State of Missouri. That petition alleged that petitioner, then fourteen years of age, had committed an offense, specifically murder, which brought her under the jurisdiction of the juvenile court. Under § 211.071, R.S. Mo., a motion was filed by the juvenile officer's attorney to dismiss the petition and allow prosecution of the petitioner as an adult under the general laws of the State of Missouri. By Order dated March 19, 1986, the petition was dismissed, thereby certifying petitioner to stand trial as an adult.

The Missouri statute under which petitioner was certified to stand trial as an adult on the murder charge requires the juvenile court to consider certain criteria in determining whether the juvenile is a "proper subject to be dealt with under the provisions of [the juvenile code]" and "whether there are reasonable prospects of rehabilitation within the juvenile justice system." § 211.071(6), R.S.Mo. (Supp. 1990). Those criteria are listed in the statute as required standards for judicial deliberation, although not exhaustive.[3]

According to the transcript of the certification hearing, two witnesses testified as to whether petitioner should be treated by the juvenile court or released for prosecution in the circuit court. Those witnesses were Chief Juvenile Officer Rebecca James Clark and William Bailey, Program Administrator for the Missouri Division of Youth Services. In addition, a report was prepared and submitted to the court by the juvenile officer, pursuant to the applicable statute, § 211.071 R.S.Mo., (Cert. Tr. at 21) and a psychiatric evaluation of petitioner was prepared and submitted for the court's consideration. (Cert. Tr. at 7). Petitioner was represented at the hearing by retained counsel, Mr. John Lozano and by Mr. Lee Nation, retained by petitioner's father. Cross-examination by both counsel of the two witnesses was conducted on petitioner's behalf.

Petitioner contends that no evidence was adduced at the certification hearing which justified the court's decision to certify her to stand trial as an adult, presumably constituting a violation of petitioner's due process rights under the United States Constitution. Under current federal Constitutional law, the statutory procedures employed by a state under its juvenile code which authorize a juvenile court to determine the fitness of a juvenile to stand trial as an adult on a criminal charge are subject to fundamental due process limitations. The exact scope and definition of specific Constitutional rights which attach at such proceedings, however, are not clear. "Procedural protections which must be afforded a juvenile before he may be transferred to adult offender status vary in terms of the particular statutory scheme which entitles him to juvenile status in the first place." *Stokes v. Fair*, 581 F.2d 287, 289 (1st Cir. 1978) *cert. denied*, 439 U.S. 1078, 99 S.Ct. 858, 59 L.Ed.2d 47 (1979) (applying *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), which had construed a District of Columbia juvenile certification statute). In *Kent*, the United States Supreme Court held that such a statutory procedure must be interpreted "in the context of constitutional principles relating to due process and the assistance of counsel." *Id.* at 557, 86 S.Ct. at 1055.

---

**3.** The criteria include seriousness of the offense alleged, protection of the community by certifying the juvenile to be prosecuted in a court of general jurisdiction, nature of the offense, past juvenile history of the child, whether a pattern of offenses by the juvenile exists, sophistication and maturity of the child considering his or her home life and emotional condition, the program and facilities available to the juvenile court in considering disposition and whether the juvenile can benefit from any treatment or rehabilitative facilities available to the court. § 211.071(6) R.S.Mo. (Supp.1990).

■ Further, in *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), the Supreme Court stated that "... the Court has never attempted to prescribe criteria for, or the nature and quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court." *Id.* at 537, 95 S.Ct. at 1790. Under *Kent,* it may be inferred that the nature and quantum of such evidence must comport with the fundamental fairness of due process. Therefore, any Constitutional violation based on insufficiency of evidence to support transfer of a juvenile to be tried as an adult must rise to the level of a due process violation.

■ In the certification hearing held to determine petitioner's status for the possible charge of murder with a maximum penalty of death, the juvenile court had the benefit of personal testimony, a report by the juvenile officer and a psychiatric evaluation of petitioner which included a recommendation that petitioner be dealt with by the juvenile court. (Stip. # 3 at p. 33–35). The evidence presented to the court conformed with and related to the criteria relevant to judicial consideration as listed in the juvenile code statute.[4] Under *Breed,* any evaluation and judgment as to the weight given to such evidence by the juvenile court is a matter of state law, not cognizable under federal habeas proceedings. After a review of the certification hearing transcript, although this Court might have decided differently, we do not find that the evidence presented to the juvenile court at the certification hearing was so insufficient as to rise to the level of a due process violation. Under current federal law, petitioner's federal due process rights were not violated by application to her of the Missouri statutory procedures for certification to stand trial as an adult, insofar as the sufficiency of the evidence presented and considered by the juvenile court in the certification proceeding.

## VOLUNTARINESS OF PLEA

■ Petitioner's primary contention for habeas corpus relief from this Court rests upon allegations that the *Alford* plea, made as a part of a plea bargain, was not made voluntarily, knowingly and intelligently, in accordance with prevailing federal Constitutional law. Extensive testimony was taken at the evidentiary hearing in this Court from petitioner, Lee Nation, her counsel at the time the plea was taken, prosecutor John O'Bannon and Judge L. Thomas Elliston, Jasper County, Missouri Circuit Court who took the plea and imposed the eleven year sentence rather than the five year probation contemplated by the plea bargain.

As stated above, petitioner, on advice of her counsel, entered an *Alford* plea to a reduced charge of manslaughter as part of a plea bargain with the prosecutor which also provided for a presentence report, a five year term of probation and supervision by a juvenile court. (Stip. ¶ 5) Petitioner filed a motion to withdraw her *Alford* plea on November 3, 1986, approximately six weeks after the plea was entered. After hearing on the motion, at which petitioner was represented by new counsel, the court denied the motion and sentenced petitioner to eleven years incarceration, denying her the probation called for by the plea bargain. (Stip. ¶ 10)

"Whether a waiver of constitutional rights is effective is an issue governed by federal standards." *Griffith v. Wyrick,* 527 F.2d 109, 112 (8th Cir.1975) (citing *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). A plea of guilty is a waiver of constitutional rights subject to the limitations of federal Constitutional principles embodied in the due process clause of the United States Constitution. *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969). "The standard [is] whether the

4. Testimonial evidence included information as to state resources available to a juvenile in the particular circumstances of this petitioner (Tr. at 23, 46–47); the past juvenile history of the petitioner (Tr. at 15–19); and the sophistication and maturity of petitioner as contained in the psychiatric report (Tr. at 33–35). There was also evidence adduced that no secure facilities for long term detention existed within the resources of the state for a juvenile who required secure detention for an extended period of time. (Tr. at 27).

plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970). An *Alford* plea, as was entered by petitioner, results when a defendant pleads guilty and consents to imposition of a sentence even though maintaining innocence of the crime charged. Such a plea, virtually identical to a *nolo contendere* plea, and approved as Constitutional by the Supreme Court in *Alford*, requires a knowing and intelligent conclusion by a defendant that his or her best interests require entry of a guilty plea and court records indicate "strong evidence of actual guilt". *Id.* at 37, 91 S.Ct. at 167. The voluntary nature of the plea can best be exhibited by the "strong factual basis for the plea demonstrated by the State and [the defendant's] clearly expressed desire to enter it despite [a] professed belief in his innocence." *Id.* at 38, 91 S.Ct. at 168. In the pending case, in order to avoid a finding of Constitutional violation of petitioner's due process rights, this Court must find that petitioner made an intelligent and knowing waiver of her Constitutional rights as expressed by a clear desire to enter an *Alford* plea despite protestations of actual innocence of the crime charged. Under *Alford*, petitioner must also have made a voluntary choice among alternative courses of action available to her in lieu of the plea.

The evidence in this case, in the form of testimony by petitioner, her counsel, the prosecutor and judge, clearly shows that petitioner, a fifteen year old at the time, was induced by promises of probation, pressure from family members and confusion about the meaning and consequences of an *Alford* plea, to enter the plea without a full understanding of the nature of her action.

Contributing to the totality of the circumstances which indicate that petitioner did not knowingly and intelligently enter the *Alford* plea is the fact that Judge Elliston refused to allow petitioner to withdraw her plea six weeks after it was entered. Although withdrawal of a guilty plea, or an *Alford* plea, before sentencing is not a Constitutional right, both state and federal courts have held that fundamental fairness requires a defendant be allowed to withdraw such a plea before sentencing, *if the judge has determined that he will reject the plea agreement.* *Schellert v. State*, 569 S.W.2d 735, 739 (Mo.1978) (en banc); *United States ex rel. Culbreath v. Rundle*, 466 F.2d 730 (3rd Cir.1972); *United States v. Gallington*, 488 F.2d 637 (8th Cir.1973), *cert. denied*, 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974). Rule 11(e)(4), Fed.R.Crim.P. and Missouri Rule 24.02(d)(4) also provide for permitting a defendant to withdraw a guilty plea or an *Alford* plea if the court rejects the plea agreement.

■ The policy behind such judicial and legislative decisions derives from *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), which held that a plea of guilty taken as part of a plea agreement which included a recommendation for sentence by the prosecution was invalid where a different prosecutor breached the plea agreement prior to sentencing. The reasoning behind the *Santobello* decision rests upon notions of fundamental fairness due process guarantees afforded under the Constitution to a defendant who has waived significant Constitutional rights to a jury trial by entering into a bargain with the state for a quid pro quo in exchange for a plea of guilty. As evidenced by the cases cited above as well as Missouri and federal rules respecting plea bargains, the underlying rationale of *Santobello* has been applied to situations where a trial judge has determined prior to sentencing that he will reject the terms of the plea bargain respecting sentencing of the defendant. Judicial discretion clearly allows a trial judge to determine by independent decision that the terms of the plea bargain are not appropriate to a particular case notwithstanding the agreement between the prosecutor and defendant. But a decision to reject the bargain and subject a defendant to punishment differing from that which was agreed upon without advising the defendant of that decision in advance of sentencing and permitting with-

drawal of the guilty plea might, under particular circumstances, rise to the level of a due process violation. In this case, the Court believes that the judge's decision to reject the bargain and refuse withdrawal of the plea was one factor contributing to the violation of petitioner's due process rights which resulted in an involuntary waiver of her Constitutional rights.

■ A review of the transcripts from the hearing on petitioner's *Alford* plea and from the hearing on petitioner's motion to withdraw that plea reveal ample evidence supporting the Court's finding that petitioner did not enter a knowing, intelligent and voluntary *Alford* plea. The testimony given at the evidentiary hearing held in this Court on May 15, 1990 further disclosed that petitioner, at the time she was charged with the murder of her mother was a confused, frightened fifteen year old who was subjected to intense pressure by her father and family members and who did not and still does not understand the implications of an *Alford* plea.

The transcript[5] of the hearing at which petitioner's *Alford* plea on a reduced charge of voluntary manslaughter was accepted by the trial court reveals that the judge found that the plea was entered voluntarily. (Plea Tr. at 22). The judge questioned petitioner as to her understanding of her waiver of rights to a trial and the meaning of her plea, during which time he stated:

Q. Now, Stacy, if I understand correctly this morning, you're telling me, or you're going to tell me, that you're not guilty of this Manslaughter?

A. Yes, sir.

Q. But you're also telling me that you're wise enough to know that you would rather plead guilty to Manslaughter than take the risk before a jury with a charge of Murder in the First Degree, where the only two things that jury could do if they convicted you is either sentence you to life in prison or sentence you to death?

A. Yes, sir.

(Plea Tr. at 10)

Following this exchange between petitioner and the trial judge, the state presented the evidence which would have been submitted on the first degree murder charge and the judge reviewed the probation term of the plea bargain with petitioner:

Q. Stacy, do you understand that if I do place you on probation, that under this plea bargain that you would have to stay under the supervision of a Juvenile Court?

A. Yes, sir.

Q. Do you also understand that since you have been certified as an adult, you would also have a probation officer from the State Board of Probation and Parole?

A. Yes, sir.

Q. Do you understand that if I follow this plea bargain agreement and placed you on probation, there would be some very strict requirements by both me and the Juvenile Court that you'd be under and the probation officer for things for you to do—

A. Yes, sir.

Q. —and for things for you not to do?

A. Yes, sir

Q. And that there would just be an awful lot of control over you?

A. Yes, sir.

Q. Do you understand that, Stacy?

A. Yes, sir.

Q. And that this would exist for five years; in other words, you would be 20 years old before you got out from under the control of the Juvenile Court, this Court and Probation and Parole?

A. Yes, sir.

(Plea Tr. at 19–20.)

At no time during this questioning of petitioner did the judge indicate that probation would not be granted and the plea bargain not honored. Indeed, from all appearances, this questioning suggests that probation would be granted by the judge. Questioning petitioner in detail about her understanding of the terms of the proba-

5. Transcript of the Alford plea hearing will be    designated in this Order as Plea Tr.

tion clearly indicates an intention to grant probation, not incarceration.

Immediately following this exchange, the judge questioned petitioner on her understanding of the plea bargain, as it was written and submitted to the court at the hearing:

Q. Do you have any questions at all about that plea bargain and the meaning of that plea bargain?

A. No, sir.

Q. Do you think this plea bargain guarantees you that you're going to get probation?

A. Yes, sir.

Q. You think it does guarantee you that you're going to get probation, or do you understand that that decision is finally up to me?

A. I understand that that decision is finally up to you.

(Plea Tr. at 20–21).

At no time following this exchange did the trial judge further attempt to clarify petitioner's understanding of the plea bargain's effect on the judge as a mere recommendation and not a guarantee. He had made exhaustive explanations as to the recommendations and their non-binding effect on his ultimate decision, only to have petitioner state that she believed probation was guaranteed. He followed up on that basic misunderstanding with one question to petitioner. At no time during the exchange relating to the plea bargain did the judge advise petitioner that she could indeed be sentenced to a prison term and actually serve time in jail as a result of her plea. At the evidentiary hearing in this Court, Judge Elliston testified:

Q. ... At any time in this hearing where she (petitioner) entered her plea, did you tell her, Stacy, do you understand that even though these people are recommending probation that I might send you to jail? Did you ever say that?

A. Not in those words, no.

(Evid. Tr. at 150–151)

Petitioner's counsel at the plea hearing, Lee Nation, testified at the evidentiary hearing as to his understanding of the ramifications of the plea bargain and his im-

pressions of the judge's acceptance prior to taking of the plea.

A. It was one of those situations where in my opinion that the likely outcome of the case would be that Stacy was acquitted, so—would be acquitted. Therefore we weren't in a position really on a first degree murder to take possibly the normal kinds of plea bargains that would be presented to a defendant. We obviously weren't going to plead guilty to any sort of jail time, and it came as somewhat of a surprise to me that there was an offer of a recommendation of probation on a manslaughter.

.        .        .        .        .

Q. ... would you normally expect this kind of offer in a murder one case?

A. No.

.        .        .        .        .

Q. And did it in your mind reflect an admission by the prosecutor as to the strength of his case?

A. Certainly.

Q. Which would indicate what kind of admission?

A. That it was not a strong case.

(Evid. Tr. at 28–29)

Q. And did you have a discussion with the court prior to entering the plea?

A. Yes.

Q. ... And what was that discussion?

A. Well, there was at least one discussion at the courthouse, I believe it was in Carthage that morning, and there may have been another discussion either over the phone or in person.

.        .        .        .        .

A. It occurs to me that Mr. O'Bannon and I wouldn't have just shown up in Carthage with this kind of a plea arrangement unless we'd run it past the judge first.

(Evid. Tr. at 35)

Testimony from Nation established that the plea agreement indicated to him, from his years of criminal defense experience, that the state believed a conviction on first degree murder was unlikely. Nation's tes-

timony also established that he had no reason to believe, after discussions with Judge Elliston, that petitioner would not receive the recommended five year probation term and supervision by a juvenile court. This belief was communicated without doubt to petitioner, inducing her to enter the *Alford* plea.

Q. Was there any question in your mind that Stacy would be placed on probation?

A. No.

Q. In fact had you believed that the court had committed itself to a probation?

A. Yes.

Q. Had you not had that belief, would you have taken a different tact (sic) in the case?

A. I believe that unless I had gotten some positive feedback from the court that this was going to happen, I don't think I would have done it.

Q. Okay. And did you ever lead Stacy to believe that there was any possibility that she would not be placed on probation?

A. Well, I'm sure that I told Stacy that she was going to get probation as long as ... I'm sure I led her to believe that there would be a probation.... I thought it highly likely that probation would be granted absent some very unusual, unforeseen circumstances and I'm sure I communicated that probation would be given.

(Evid. Tr. at 40)

All of the above testimony indicates that without doubt, petitioner's counsel believed the plea bargain would be honored by the judge and that this belief was communicated strongly to his client. A fifteen year old who was facing first degree murder charges and was advised by her counsel to enter an *Alford* plea based upon promises that she would receive probation instead of incarceration was unquestionably induced to follow that advice. The belief of petitioner's counsel that the plea bargain would be honored was based upon years of dealing with prosecutors and trial judges in negotiation and enforcement of recommendations incorporated in plea agreements.

Petitioner testified at the hearing on her motion to withdraw her *Alford* plea that she had been coerced into the plea, that she did not understand the consequences and that she wished to go to trial on the charges which had been filed originally:

Q. ... did you have a conversation with your attorney, Mr. Lee Nation, on that day before the Alford plea was taken by this Court?

A. On that day I did.

Q. Did Mr. Nation talk with you about what the Alford plea meant for you?

A. Not really.... He told me if I went to trial, there wasn't going to be a chance in history. He said that I would get the gas chamber or life in prison without parole ... and I'd have to testify against my father.

Q. What else did Mr. Nation tell you on that day about entering your guilty plea?

A. He ... simply stated that ... to enter it and to not go to trial. Sort of put a bind on me.

Q. Did you want to enter your Alford plea on that day?

A. No, I didn't.

.     .     .     .     .

Q. Did you ask him again ... about wanting to go to trial? ... Did you continue to ask him?

A. After he told me what he told me, I didn't want to, it seemed like I had no choice.

.     .     .     .     .

Q. Do you want to go to trial on this charge?

A. Yes, I do.

.     .     .     .     .

Q. Do you think that you gave your Alford plea to the Judge here on September 16, 1968, voluntarily? Did you want to do it?

A. No, I did not.

**1352**

(Sent. Tr. at 15–16).[6]

Likewise, at the evidentiary hearing in this court, petitioner testified:

Q. Did you at some point in time tell Mr. Nation that you didn't want to go to trial?

A. Yes....

Q. ... What was in your mind when you said that to him?

A. What would be in any 14 or 15 year old's mind. I was scared to death. I was scared. I didn't want to relive what happened September 3rd 1985, all over again. I had to relive it enough with my father pounding it in me. I didn't want to remember no more.

(Evid. Tr. at 85)

Petitioner also testified about her state of mind at the time the plea was actually entered:

Q. ... But ultimately it was you who would make the decision, isn't that correct?

A. Well, sort of. Ultimately, yes. In a way I felt like I was pushed into it. After knowing what my consequences were when I went to trial, I either had there (sic) choices, prison, life in prison or the death penalty.

.    .    .    .    .

Q. Did you ever believe that the Judge could send you to jail?

A. No.

Q. Did the Judge, during the entry of the plea, ever tell you that he might send you to jail?

A. Not to my knowledge, no. He said that we didn't have to—he didn't have to take the five years recommendation.

Q. Well, what did that mean to you?

A. Not much really. Not at that time.

Q. When did it mean something to you?

A. Pretty much I'd say probably three to six months after everything was over with, after I went to jail. Then it meant something.

(Evid. Tr. at 86, 88).

Petitioner evidenced her lack of understanding of the consequences of the *Alford* plea at the evidentiary hearing. That misunderstanding obviously was present at the time the plea was taken and has never yet been completely resolved:

Q. Now, at what point did you discuss with—did you communicate with Lee Nation your desire to withdraw this guilty plea?

A. I can't recall exact word for word. I just remember I wanted to withdraw the Alford plea because my family told me it was a guilty plea.

Q. Okay.

A. And when I saw on a piece of paper it said guilty plea.

Q. Okay. In fact that's what you signed, wasn't it, a petition to enter an Alford plea of guilty?

A. An Alford plea.

Q. An Alford plea of guilty.

A. No, I never heard the plea of guilty at the end.... and if you look in there it says that I am not saying I am guilty, I am saying I am innocent.

(Evid. Tr. at 99).

This exchange with counsel for respondent at the evidentiary hearing held in this Court reveals that petitioner did not fully understand the nature and consequences of an *Alford* plea. The transcript of the plea does not indicate anywhere that petitioner was advised by the trial judge the exact nature of this plea. Considering the age of this petitioner at the time and the unusual nature of an *Alford* plea in the criminal justice system, the court owed more than a standardized, routine guilty plea recitation to this defendant. She believed that she was maintaining her innocence of the charge, which she was, but she clearly did not understand that she was also simultaneously pleading guilty to a lesser charge for which she could be incarcerated for a considerable period of time. Under applicable Constitutional principles concerning waiver of constitutional rights by pleas of

---

**6.** (Sent. Tr.) references are to transcript of petitioner's hearing on motion to withdraw her pri- or Alford plea, at which time the court imposed sentence, November 3, 1986.

guilty, this petitioner did not knowingly and intelligently enter an *Alford* plea. For that reason, the Court finds that her Constitutional rights to due process were violated. The age of the defendant, the pressure exerted by outside influences, her lack of understanding of the nature of the plea she entered, the failure of the trial judge to fully explain and review the consequences of her plea and the possible outcome of failure by the court to enforce the plea bargain, and the judge's failure to allow petitioner to withdraw her plea when requested to do so before sentence was imposed, all combine as circumstances which, taken as a whole, lead inescapably to the conclusion that petitioner's plea was not voluntary, her rights were not knowingly and voluntarily waived and her due process rights were violated.

Rule 23(c) of the Federal Rules of Appellate Procedure contemplates the immediate release of one who is in custody and ordered released by a federal court in a habeas proceeding. That rule states:

> Pending review of a decision ordering the release of a prisoner in [a habeas corpus] proceeding, the prisoner shall be enlarged upon the prisoner's recognizance, with or without surety, unless the court or justice or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of either court shall otherwise order.

Having observed petitioner and listened to her testimony in the May 15 hearing, the Court finds that petitioner does not pose a substantial risk of flight and that a surety is not required. Petitioner will therefore be released on her own recognizance.

Accordingly, it is hereby ORDERED:

1) that Stacy Mechelle Simpson's petition for the writ of habeas corpus is conditionally GRANTED and her conviction is VACATED and SET ASIDE; this conditional issuance of the writ shall become unconditional and permanent unless petitioner is allowed by the State of Missouri to withdraw her *Alford* plea and grants petitioner a trial on the original charges within sixty (60) days of the date of this Order;

2) that respondent, pursuant to Fed.R. App.P. 23(c), immediately release petitioner Stacy Mechelle Simpson from custody;

IT IS SO ORDERED.