Didi Sallings, Executive Director Arkansas Public Defender Commission 101 East Capitol, Suite 201 Little Rock, AR 72201
Dear Ms. Sallings:
I am writing in response to your request for my opinion regarding the scope of the Division of Youth Services' authority unilaterally to order the pickup and recommitment to secure custody of a juvenile who has conditionally been reintegrated into the community. You report that a particular juvenile was detained in one youth services facility pursuant to a pickup order issued following her supervised release, supposedly into the custody of her aunt, from another youth services facility. The pickup order recited as authority for the recommitment "Section 13 of Act 502 of 1977 (Arkansas Statute § 45-513) as amended by Act 26 of 1979." You report that after being conditionally released, the juvenile was living in a private domicile other than that of her "guardian,"[1]
apparently in violation of her aftercare plan. Against this backdrop, you have posed the following questions:
 1. What constitutes a youth services center or facility under A.C.A. § 9-28-211?
 2. Does the Division of Youth Services ["DYS"] have the authority to direct a law enforcement agency to take a child into custody who has been discharged and return them [sic] to a DYS facility?
RESPONSE
With respect to your first question, the terms "youth services center" and "youth services facility" are defined by statute at A.C.A. §9-27-303. With respect to your second question, the law is confusing. On the one hand, the law provides that commitment — and, by implication, recommitment — to a youth services center or facility must be by order of the court. On the other hand, DYS has statutory authority to move a juvenile within its system of youth services centers or facilities and community-based programs, which would suggest that DYS could unilaterally decide to recommit a youth who has not yet been "discharged" from DYS custody by formal release. For reasons discussed below, I believe it is questionable whether DYS may order the pickup of a youth in aftercare for recommitment to indeterminate secure custody without first obtaining court approval. Legislative or judicial clarification on this point is warranted. I further believe a youth picked up for violating conditions of aftercare is entitled to a probable-cause hearing to satisfy due-process concerns. Finally, I believe DYS must obtain a court order before recommitting a "discharged" youth if by "discharge" you mean unconditional, formal release from DYS custody pursuant to A.C.A. §9-28-210.
Question 1: What constitutes a youth services center or facilityunder A.C.A. § 9-28-211?
The terms "youth services center" and "youth services facility" are statutorily defined at A.C.A. § 9-27-303:
 (44) "Youth services center" means a youth services facility operated by the state or a contract provider.
 (45) "Youth services facility" means a facility, operated by the state or its designee, for the care of juveniles who have been adjudicated delinquent or convicted of a crime and who require secure custody in either a physically restrictive facility or a staff-secured facility, operated so that a juvenile may not leave the facility unsupervised or without supervision.
The latter definition is repeated verbatim at A.C.A. § 5-54-101(13). Although chapter 28 of title 9 of the Code does not contain a separate set of definitions, I have no reason to assume that the definitions set forth in the immediately preceding chapter and in title 5 should not apply.
Question 2: Does the Division of Youth Services ["DYS"] have theauthority to direct a law enforcement agency to take a child into custodywho has been discharged and return them [sic] to a DYS facility?
The currently applicable statute referenced in your first question, which incorporates its predecessor, Ark. Stat. Ann. § 45-513, provides:
9-28-211. Escape from youth services center or facilities.
 (a) If any delinquent youth committed to the Division of Youth Services escapes or absents himself from a youth services center or facility without authorization, he may be returned to the facility by a law enforcement officer without further proceedings.
 (b) No law enforcement officer, Department of Human Services Institutional System Board member, Division of Youth Services employee, or other person shall be subject to suit or held criminally or civilly liable for his actions provided he acts in good faith and without malice in the apprehension and return of escapees.
You have asked whether this statute would support DYS in directing a law-enforcement agency to take custody of a "discharged" juvenile and return him to a DYS facility. As discussed below, I do not believe this statute in itself invests DYS with such authority.
It is noteworthy that A.C.A. § 9-28-211 deals exclusively with the situation in which a juvenile in DYS custody "escapes or absents himself" from a "youth services center" or a "youth services facility" — i.e., from a facility that by definition provides only "secure custody." A.C.A. § 9-27-303. Considered in isolation, this statute invests DYS with the power unilaterally to order a custodial arrest without juvenile court participation only if a juvenile has escaped or absented himself from such a secure facility, as opposed to merely failing to observe the residency restrictions set forth in an aftercare plan. In my opinion, then, the provisions of A.C.A. § 9-28-211 cannot apply once a juvenile has actually been "discharged" from "secure custody," regardless of whether the home placement is considered a general "discharge" from DYS custody.
The question remains whether DYS might be otherwise authorized to direct that a juvenile in violation of an aftercare plan be returned to secure custody. One statute that bears on this question contains the following definition of "commitment": "`Commitment' means an order of the court which places a juvenile in the custody of the Division of Youth Services of the Department of Human Services for placement in a youth services facility." A.C.A. § 9-27-303(10) (Supp. 1999). The definition expressly equates "commitment" with secure detention — viz., "placement in a youth services facility" — and it further provides that "commitment" is "an order of the court." Similarly, A.C.A. § 9-27-330(a)(1)(B)(i) (Supp. 1999) authorizes the court to "[c]ommit the juvenile to a youth services center using the risk assessment system for Arkansas juvenile offenders distributed and administered by the Administrative Office of the Courts." These statutes suggest that if a juvenile has been released from "commitment" thus defined — i.e., from "secure custody" — DYS cannot direct a law enforcement agency to arrest the juvenile for recommitment without first obtaining an order of commitment from the juvenile court pursuant to A.C.A. § 9-28-208.
However, various provisions of the Code suggests that DYS, not the court, will determine whether a youth committed to DYS custody should be placed in "secure custody." Section 9-28-201 of the Code expresses the legislature's intent to create a single entity — namely, DYS — charged with providing "appropriate services and programs" to treat juvenile offenders committed to its care. Section 9-28-204 provides that every youth "committed to the Division of Youth Services or its designee" will be initially consigned to a "secure facility" for the purpose of "reception, orientation, classification, and adjustment." Section9-28-206 (Supp. 1999), captioned "Disposition of delinquent juvenile," provides that a court's order of commitment will be to DYS, not to any particular facility, again suggesting that DYS has exclusive placement discretion. Subsection 9-28-207 provides that "[w]hen any youth is committed to the Division of Youth Services, . . . the youth shall be under the exclusive care, custody, and control" of DYS. This restriction is in all respects consistent with A.C.A. § 9-27-330(a)(1)(B)(iv) (Supp. 1999), which provides that "[u]pon receipt of an order of commitment withrecommendations for placement, the Division of Youth Services . . . shall consider the recommendations of the committing court in placing a youth in a youth services facility or a community-based program." (Emphasis added.) Subsection 9-28-209(a)(2) directs that once a youth has been assessed in secure custody, the assessment center will make a recommendation to the Director of the Division of Youth Services, not the court, regarding placement. Subsection 209(c)(2) provides that if the Director determines that a youth should be placed somewhere other than a youth services center or facility, DYS will report that finding to, as opposed to seeking approval from, the court. DYS' exclusive authority over placement is further reflected in the following:
 The Division of Youth Services has the authority to move a youth at any time within its system of youth services centers or facilities and community-based programs or within the Department of Human Services' programs or facilities.
A.C.A. § 9-28-209(d). Finally, A.C.A. § 9-28-210 (Supp. 1999) provides that DYS will have exclusive control over a juvenile's length of stay, subject to a two-year limit of commitment, in all cases except those involving an extended juvenile jurisdiction offender.
Reconciling these apparently conflicting statutory provisions is a task too daunting for my abilities. Under the circumstances, I can only attempt to determine which of the statutory directives should be given effect — the ones investing the court with the power to place a juvenile in a youth services facility or the ones reserving that power exclusively to DYS. In doing so, I am guided by the accepted rule of statutory construction that when a word in a statute is omitted or misused, it is the duty of the courts to disregard the error if the context plainly indicates the legislative intent. Johnson v. U.S. Gypsum Co.,217 Ark. 264, 229 S.W.2d 671 (1950). In construing a statute, a court may further reconcile two conflicting descriptions by striking out words in one so as to conform to the other. Heinemann v. Sweatt, 130 Ark. 70,196 S.W. 931 (1917). See also Murphy v. Cook, 202 Ark. 1069,155 S.W.2d 330 (1941) (holding that where intent was obvious, court would substitute 50,000 for 40,000, as the latter figure was merely a typographical error). See also, Sutherland, Statutory Construction,
47.37 (5th ed.).
In my opinion, the legislative history of the above referenced statutes strongly suggests that DYS alone has discretion to place a youth committed to its custody into post-assessment secure detention, subject to the constitutional restrictions discussed below. DYS was established by Act 1261 of 1995, which is currently codified in title 9, chapter 28, subchapter 200 of the Code. As discussed above, this legislation created DYS as a single entity with ultimate control over the juveniles committed to its custody. Significantly, the above referenced statutes suggesting that the court has discretion to dictate placement in a youth services facility are contained in a different chapter of the Code. The provisions affording the court this discretion trace to section 29 of the Arkansas Juvenile Code, Act 273 of 1989, which provides:
Dispositions, alternatives for delinquency cases.
 If a juvenile is found to be delinquent, the court may enter an order making any of the following dispositions:
* * *
 (3) Commit the juvenile to a youth services center operated by the Youth Services Board.
Upon the adoption of Act 1261 of 1995, the Youth Services Board ceased to exist. In acknowledgment of this fact, the legislature in 1995 simply excised references to the Youth Services Board in the statutes granting the court the power to commit juveniles to youth services facilities in chapter 27 of title 9 of the Code. Doing so was obviously problematic in that it overlooked the fact that Act 1261 had transferred this power of commitment from the court to DYS. In my opinion, this legislative action constitutes an inadvertent oversight. Subchapter 200 of chapter 28 of title 9 of the Code reflects a clear legislative intention to locate juvenile placement authority exclusively in DYS, and I believe any contrary suggestions in a subchapter drafted prior to DYS' creation were superseded by implication and should be ignored. Needless to say, legislative clarification appears warranted.
The foregoing analysis bears on your question primarily in that it precludes me from opining that DYS cannot order an aftercare pickup because the power of commitment resides exclusively in the court. However, it does not follow that DYS has the unfettered power to order the pickup of a juvenile for indeterminate detention in secure custody. As a practical matter, a court's order of commitment to DYS custody results in commitment to a "youth services facility" as defined above — i.e., to secure custody. Even conceding that DYS has the statutory authority to continue that secure custody in a youth services facility following assessment, it is far from certain that DYS, after reintegrating a child into the community subject to an aftercare plan, can unilaterally order the pickup and recommitment of that child into secure custody for any or no reason. Indeed, as noted above, in empowering DYS to issue a pickup order whenever a juvenile "escapes or absents himself from a youth services center or facility without authorization," A.C.A. § 9-28-211(a) strongly suggests that DYS lacks such authority when a child is not in secure custody. This limitation strikes me as consistent with the liberty interest a juvenile enjoys once he has been released from secure detention, regardless of whether he might be characterized as still in the "custody" of DYS. See Golden v.State, 341 Ark. 656, 20 S.W.3d 801, 802 (2000) (acknowledging juveniles' "fundamental interests in their own liberty"). As the Eighth Circuit Court of Appeals noted in R.W.T. v. Dalton, 712 F.2d 1225, 1230 (8th
Cir. 1983):
 In recent years the Supreme Court has recognized that "there is a gap between the originally benign conception of the [juvenile-court] system and its realities," Breed v. Jones, 421 U.S. 519, 528, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975), and that juveniles are entitled to the "`essentials of due process and fair treatment,'" In re Gault, 387 U.S. 1, 30, 87 S.Ct. 1428, 1445, 18 L.Ed.2d 527 (1967) (quoting Kent v. United States, 383 U.S. 541, 562, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84
(1966)). Accordingly, the Court has held that a juvenile court must hold a hearing before it may waive jurisdiction and transfer a juvenile to criminal court, Kent v. United States, supra; that juveniles subject to delinquency adjudications must be accorded written notice, the right to counsel, the privilege against self-incrimination, and the right to confront and cross-examine witnesses, In re Gault, supra; that in delinquency adjudications, the government must prove beyond a reasonable doubt that the juvenile committed the criminal act, In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); and that double-jeopardy protections apply to juvenile adjudicatory proceedings, Breed v. Jones, supra. The Court has declined to extend only one procedural right to juvenile offenders — the right to a jury trial. In McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), the Court found that the benefits of a juvenile court's ability to function in a "unique manner" outweighed the fact-finding advantages of a jury trial. Id. at 547, 91 S.Ct. at 1987
(plurality opinion).
After citing numerous cases recognizing that "probable-cause hearings are fundamental to juveniles' rights to due process," the Court in Dalton
concluded: "The right not to be jailed for any substantial period of time without a neutral decision that there is probable cause is basic to a free society. Children should enjoy this right no less than adults." Id.
at 1231. See Reno v. Flores, 507 U.S. 292, 315 (1993) (acknowledging that even alien juveniles "have a constitutionally protected interest in freedom from institutional confinement. That interest lies within the core of the Due Process Clause.") (O'Connor, J., concurring).
At issue, in my opinion, is whether these constitutional mandates in any way conflict with or restrict the scope of DYS' statutory "authority to move a youth at any time within its system of youth services centers or facilities and community-based programs or within the Department of Human Services' programs or facilities." A.C.A. § 9-28-209(d). If read as empowering DYS arbitrarily and without any procedural safeguards to transfer one of its charges from the most minimal supervision in a community-based program into the most restrictive secure detention, this statute might well be constitutionally suspect. In Schall v. Martin,467 U.S. 253, 274 (1984), the U.S. Supreme Court pronounced that in order to pass constitutional muster, a statute restricting a juvenile's liberty must both serve a legitimate state interest and establish procedures that "provide sufficient protection against erroneous and unnecessary deprivations of liberty." Even conceding that the state has a legitimate interest in affording DYS flexibility in its placement determinations, I do not believe DYS can exercise that flexibility by depriving a juvenile of his freedom without even affording him an opportunity to be heard. SeeGagnon v. Scarpelli, 411 U.S. 778 (1973) (probationer arrested for violation of conditional release entitled to prompt hearing to determine if there exists probable cause to believe a violation has occurred);Morrisey v. Brewer, 408 U.S. 471 (1972) (same for parolee).
In my opinion, then, a recommitted juvenile is entitled to a post-pickup hearing. With respect to the pickup itself, if it is deemed an arrest and is made in a public place, I suspect a court would conclude that the police officer would be authorized to make it without a warrant if he has probable cause to believe that the juvenile has violated a material condition of the aftercare plan.[2] Payton v. New York, 445 U.S. 573,587 (1980) ("warrantless arrests in public places are valid"). However, again assuming the pickup amounts to an arrest, if the pickup were made in the juvenile's home, a court would likely conclude that the officer would need to obtain an arrest warrant in order to avoid violating the juvenile's reasonable expectation of privacy. Id. at 576 ("theFourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643; Wolf v.Colorado, 338 U.S. 25, prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine" arrest). Finally, if the arrest were made in a third party's dwelling or in the non-public areas of a private business, a court would likely require the officer to obtain a search warrant based on probable cause to believe the offender could be found there — a condition designed to protect the occupant's reasonable expectation of privacy. Steagald v.United States, 451 U.S. 204, 213-14 (1981) (requiring search warrant to enter residence in order to execute arrest warrant against nonresident); attached Ark. Op. Att'y Gen. No. 2001-021 (opining that police must obtain search warrant to execute arrest warrant against employee located in a non-public area of a private business).
However, there is some question whether the pickup of a juvenile in aftercare should be characterized as an "arrest" and, consequently, whether the conditions just described apply. The nature and strength of the state interest at issue in allowing DYS-controlled arrest and detention of a juvenile in aftercare is suggested in Cherry v. State,302 Ark. 462, 791 S.W.2d 354 (1990), which addressed the analogous issue of whether a parolee could be subjected to a warrantless residential search conducted by his parole officer without offending the Fourth Amendment. Although this case involved a search, not an arrest, the court's analysis is useful in considering the nature of the "seizure" involved in picking up a juvenile. See Payton, 445 U.S. at 585 ("the arrest of a person is `quintessentially a seizure'") (quoting United States v. Watson,423 U.S. 411, 428 (1976) (Powell, J., concurring)).
Weeks before the search at issue in Cherry, the parolee had signed a waiver entitled "Notice to Parolees" that provided as follows:
 "Any parolees' [sic] person, automobile, residence, or any property under his control may be searched by a parole officer without a warrant if the officer has reasonable grounds for investigating whether the parolee has violated the terms of his parole or committed a crime."
Id. at 466. The Court held, inter alia, that signing the notice constituted "implied consent" to the search and proceeded to consider "whether such a consent-in-advance is valid":
 The recent United States Supreme Court case of Griffin v. Wisconsin, 483 U.S. 868 (1987), is instructive. At issue in Griffin was an administrative regulation permitting a probation officer to search a probationer's home without a warrant, so long as there were reasonable grounds to believe contraband was present. The regulation explicitly defined "reasonable grounds."
 The Court held that a warrantless search pursuant to this regulation did not violate the 4th amendment. The Court recognized that supervision of probationers is a "special need" of the state, permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large. Therefore, it was concluded, it is impractical to require a search warrant. It was also concluded that the usual requirement that probable cause exist to justify a search may be replaced by the reasonable grounds standard.
 Using the same reasoning, we hold that this warrantless search, pursuant to appellant's implied consent, did not violate the 4th amendment. The special needs of the parole process call for intensive supervision of the parolee making the warrant requirement impractical. It is also clear, although the United States Supreme Court did not employ this line of reasoning, that the appellant, as a parolee, has a diminished expectation of privacy. Legally, he is still in custody of the penal institution from which he was released. See Ark. Code Ann. 16-93-701(b)(4) (1987). Finally, we note that there was no contention on the appellant's part that his consent was not given voluntarily and intelligently.
 We must point out that a parole/probation officer's ability to conduct a warrantless search is not unlimited. But the consent in this case, like the regulation in Griffin v. Wisconsin, supra, contains elements that insure a search will be conducted reasonably. First of all, the consent allows a warrantless search only if reasonable grounds exist. Second, the consent does not extend to all law officers, but only to parole officers, thereby preserving its purpose as a tool of parole supervision.[3]
 Having decided that the consent is valid, the final question is whether the search was carried out under the terms of the consent. Two issues must be addressed: 1) were there reasonable grounds to investigate whether the appellant had violated the terms of his parole, and 2) was the search conducted by a parole officer? We find there was compliance with both of these terms.
Id. at 467-68. See also, Freeman v. State, 34 Ark. App. 63, 806 S.W.2d 12
(1991) (upholding search of a parolee's residence under this same standard).
When applied to your particular request, the Court's analysis is both instructive and, in some respects, troubling. The state's interest in supervising juveniles in aftercare is easily as strong as its interest in supervising adults on probation. Moreover, juveniles subject to aftercare conditions would appear to have variably diminished expectations not only of privacy, but also of liberty, the variations depending on the stringency of the conditions imposed in each case. It might seem appropriate, then, to conclude that the state's interest would warrant" permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large" — specifically, that it would justify a DYS officer in effecting at least a warrantless search, if not necessarily an arrest, based on "reasonable grounds," as opposed to "probable cause," perhaps subject to a condition that the juvenile have either openly or constructively consented to the search. Indeed, as noted above, in Griffin, the U.S. Supreme Court approved just such a search of a probationer's residence where authorized by administrative regulations that also defined as a violation of probation refusing to consent to a search. However, I am unclear from your request whether juveniles in aftercare have consented to any abridgment of what might otherwise have been their Fourth Amendment rights or, for that matter, whether the concept of consent can even meaningfully apply to a minor.See Deckard v. State, 425 N.E.2d 256 (Ind.App. 1981) (declining to give effect to juvenile's written waiver of Fourth Amendment rights in juvenile delinquency proceeding where statue permitted waiver by counsel, parent or guardian and where mother was present when waiver was signed). It thus appears uncertain to what extent the principle of consent applies. I am further troubled that the pickups referenced in your request are apparently undertaken by the police without direct participation by the parole officer. The Court in Cherry placed some significance on the fact that the waiver of rights extended only to parole officers, not to police officers.
More importantly, as suggested above, even assuming a "consensual," warrantless search might be justified for the purpose of determining whether a juvenile has violated the conditions of aftercare, it hardly follows that an impingement upon liberty in the form of indeterminate secure custody would be as readily justified. In the absence of judicial guidance on this point, I am unable to articulate a fixed standard that would apply to the pickup of juveniles in aftercare, other than to say that I believe a child picked up for indeterminate detention is at least entitled to a hearing for reasons set forth in Gagnon and Morrisey,supra. Various jurisdictions have adopted the position that a probationer or parolee — or, by logical extension, a juvenile in aftercare — remains in "constructive custody," thereby rendering his pickup something other than an arrest subject to constitutional restrictions. See, e.g., Peoplev. Kanos, 14 Cal. App. 3d 642 (1971).[4] In practice, DYS apparently takes the position that its charges are in custody until they are formally released by the Director pursuant to A.C.A. § 9-28-210 — an event that does not occur until all conditions of aftercare have been met. Nevertheless, merely noting as much does not resolve the constitutional question of whether DYS can pick up and recommit a youth based solely on its own conclusion that doing so is warranted.
If faced with this question, the Arkansas Supreme Court might possibly extrapolate from Cherry, imputing some "implied consent" to juveniles or else attenuating the consent requirement on the theory that the state stands in loco parentis to DYS charges.[5] If so, the court might go on to apply the "reasonable grounds" standard it adopted from Griffin,
concluding that a parole officer, but perhaps not a policeman unaccompanied by a parole officer, could effect a warrantless arrest in public or at a youth's home if the officer had reasonable grounds to believe the youth had violated a material condition of aftercare. However, given the Supreme Court's directives in Steagald, I suspect a court would conclude that to effect the pickup in the home of a third party or the nonpublic areas of a private business, the authorities would have to obtain a search warrant based on probable cause to believe the offender could be found there. The court might further conclude that DYS could recommit the youth to secure custody upon establishing in a hearing that it had reasonable grounds to do so, perhaps defining" reasonable grounds" as a justifiable belief that the state's interest in the detention (including its interest in serving the child's welfare) outweigh the youth's Fourth and Fourteenth amendment privacy and liberty interests. See Delaware v. Prouse, 440 U.S. 648, 654 (1979) ("[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."); accord,Washington v. State, 42 Ark. App 188, 194 (1993).
However, I cannot offer these predictions as a formal opinion regarding the state of existing law. I am an executive officer and, as such, cannot encroach on legislative and judicial prerogatives by prescribing or declaring law. I can only offer the following opinions: (1) A.C.A. §9-28-211, the authority recited in the pickup order attached to your request, authorizes only the pickup of juveniles who have left secure detention without authorization, not juveniles who have violated the conditions of aftercare; (2) pursuant to the rule of statutory construction called "expressio unius est exclusio alterius" ("to express the one is to exclude the other"), A.C.A. § 9-28-211 may well be read as reflecting a legislative intention that all other pickups be authorized only by court order; and (3) the statute authorizing DYS to move its charges among various secure and non-secure facilities and programs, A.C.A. § 9-28-209(d), may be qualified both by A.C.A. § 9-28-211 and by the constitutional principles discussed above. In offering the latter of these opinions, I am not venturing to suggest that the statute is unconstitutional, but rather that a court might dictate that it be narrowly read to restrict peremptory, unreviewed DYS pickups. As previously noted, legislative or judicial clarification appears warranted.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP/JHD:cyh
[1] My inquiries reveal that the intended custodial adult was in fact not a court-appointed "guardian," but rather a maternal aunt who held the natural mother's power of attorney. It appears that the juvenile was initially placed in a youth services facility operated by a private contractor that crafted the aftercare plan. Upon discovering that the juvenile was not residing with her aunt, the private contractor determined that her domicile was nevertheless acceptable. Based on various other factual considerations, DYS reportedly overruled this determination and issued the pickup order that led to the juvenile's detention.
[2] I use the term "material" advisedly. As discussed above, a reviewing court might well conclude that a minor infraction of aftercare does not warrant compromising a juvenile's liberty. See People v.Bremmer, 30 Cal. App. 3d 1058, 106 Cal. Rptr. 797 (1973) (holding unlawful a police search of a known probationer who committed a minor traffic offense).
[3] Courts frequently distinguish between parole officers and policemen for purposes of determining whether the warrant requirement applies. The reasoning behind this distinction is that parole officers are largely guided by the goal of rehabilitation, whereas police officers are solely guided by the goals of detecting crime and apprehending criminals — priorities that might render them overzealous in conducting searches and seizures. See generally, 4 W. LaFave, Search and Seizure: A Treatise onthe Fourth Amendment § 10.10(e) (3d ed. 1996) and cases recited therein.
[4] In his treatise on search and seizure, Professor LaFave subjects this reasoning to withering attack, as he does the premise that a probationer or parolee should be deemed to have voluntarily waived hisFourth Amendment rights if his only alternative to doing so is recommitment. 4 W. LaFave, supra at §§ 10.10(a) and (d).
[5] For an instructive discussion of the distinct lines of cases holding, on the one hand, that each child is entitled to the full panoply of constitutional rights and, on the other hand, that those rights might be diminished by the state in a spirit of paternalism ostensibly designed to serve the child's interests, see C. Espenoza, Good Kids, Bad Kids: ARevelation About the Due Process Rights of Children, 23 Hastings Const. L.Q. 407 (1996). This tension is echoed in the treatises: one announces, for instance, both that "[a] juvenile being subjected to parole revocation must be afforded all constitutional protections afforded an adult in a similar proceeding" and that "the rights of juveniles are not coextensive with those of adults, and their rights may be legitimately curtailed when the restriction serves a state's interest in promoting the health and growth of children." 47 Am. Jur. 2d Juvenile Courts andDelinquent and Dependent Children §§ 57 and 75 (1995). Espenoza proposes "apply[ing] constitutional rights on a case-by-case basis" and "recasting the issues in a manner that does not automatically defer to the parents or the state or extend rights when punishment is the goal," id. at 451-52 (footnote omitted) — a proposal that is hardly conducive to the formulation of an objective standard for dealing with children. I believe the tension between these two approaches to juvenile justice largely accounts for the difficulty in determining precisely what constitutes procedural due process for children.